IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 108,625

STATE OF KANSAS,
*Appellee*,

v.

DANA L. CHANDLER,
*Appellant.*

SYLLABUS BY THE COURT

1.

When reversal is appropriate in a criminal case, an appellate court must also address a defendant's challenge to the sufficiency of the evidence because another trial on the same charges would violate the right to be free from double jeopardy if the evidence in the first trial could not support a conviction.

2.

When a defendant challenges the sufficiency of the evidence in a criminal case, the standard of review is whether the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt after reviewing all the evidence in a light most favorable to the prosecution. The appellate court does not reweigh evidence, resolve evidentiary conflicts, or reassess witness credibility when reviewing the evidence's sufficiency.

3.

The State must prove each element of a criminal offense. Circumstantial evidence and the logical inferences properly drawn from that evidence can be sufficient to support a conviction even for the most serious crime.

1

4.

Presumptions and inferences may be drawn from established facts, but presumption may not rest on presumption or inference on inference. This rule means an inference cannot be based on evidence that is too uncertain or speculative or that raises merely a conjecture or possibility.

5.

Appellate courts employ a two-step analysis when evaluating claims of reversible prosecutorial error. These two steps are simply described as error and prejudice.

6.

To determine prosecutorial error, an appellate court decides whether the act complained of falls outside the wide latitude afforded to prosecutors to conduct the State's case in a way that does not offend the defendant's constitutional right to a fair trial. If it finds error, the appellate court determines if that error prejudiced the defendant's right to a fair trial.

7.

In evaluating the prejudice step for reversible prosecutorial error, an appellate court applies the traditional constitutional harmlessness inquiry from *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Prosecutorial error during a trial is harmless if the State shows beyond a reasonable doubt the error did not affect the trial's outcome in light of the entire record, i.e., there is no reasonable possibility the error contributed to the verdict.

8.

Every prosecutorial error will be fact specific, and any judicial review for prejudice must allow the parties the greatest possible leeway to argue the particulars of each case. An appellate court considers all alleged indicators of prejudice, as argued by

the parties, and then determines if the State has met its burden, i.e., shown there is no reasonable possibility the error contributed to the trial's outcome.

9.

When a prosecutor argues facts outside the evidence, the first prong of the prosecutorial error test is met.

10.

It is error for a prosecutor to argue the State's case or some aspect of it has judicial approval.

11.

Prosecutorial acts properly categorized as prosecutorial misconduct are erroneous acts done with a level of culpability exceeding mere negligence.

Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Opinion filed April 6, 2018. Reversed and remanded.

*Nancy Ogle*, of Ogle Law Office, L.L.C., of Wichita, argued the cause in the original argument and was on the original briefs for appellant; *Stacey L. Schlimmer*, of Schlimmer Law, LLC, of Overland Park, argued the cause on reargument, and *Adam D. Stolte*, of Stolte Law, LLC, of Overland Park, was with her on the supplemental brief for appellant; *Dana L. Chandler*, appellant, was on the pro se supplemental brief.

*Jacqueline Spradling*, chief deputy district attorney, argued the cause in the original argument, and *Jodi Litfin*, assistant district attorney, *Chadwick J. Taylor*, former district attorney, and *Derek Schmidt*, attorney general, were with her on the original brief for appellee; *Jodi Litfin*, assistant solicitor general, argued the cause on reargument, and *Michael F. Kagay*, district attorney, and *Derek Schmidt*, attorney general, were with her on the supplemental briefs for appellee.

The opinion of the court was delivered by

BILES, J.:  In a criminal prosecution, the State's obligation is to ensure its case is vigorously, but properly, championed to bring about a just conviction—not merely a win. Prosecutors are the State's instrument in fulfilling this duty. When they fail, our system fails, and the safeguards protecting the constitutional right to a fair trial strain to the breaking point. That is what happened in this case. To its credit, the State belatedly concedes one serious prosecutorial error, although there were more. We reverse Dana L. Chandler's premediated first-degree murder convictions. We remand this case to the district court for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

Mike Sisco and Karen Harkness were found dead in Karen's Topeka home about 2 p.m. on July 7, 2002. Both were shot at least five times. They were in bed as the shooting began.

There was no evidence anything was missing. When the bodies were discovered, Karen was wearing jewelry, including a diamond bracelet, a Rolex watch, and a gold ring. Mike's wallet was in his shorts. It contained two uncashed checks and $951.83 in cash. Karen's purse was on the kitchen counter. It had a billfold and $352.85 in cash. Mike's checkbook was on the dining room table. A sliding glass door leading into the house from the back was ajar. The gun was never recovered, and no fingerprints were found on the empty shell casings.

The pair had been to a casino about 45 minutes from Karen's home until about 1:30 a.m. on July 7. Several neighbors testified about their observations those early morning hours. One said she heard a car idling around 2 a.m. for 15 to 20 minutes. Around 3 a.m., she heard a loud pop she thought was a gun shot or car crashing into something. Another neighbor got home at 1 a.m. and saw no vehicles near Karen's home.

4

At 3 a.m., he heard a car door, saw the taillights of Mike's SUV, and then heard another car door. One neighbor testified she noticed Karen's garage door open at 5 a.m., which was unusual.

Several family members suspected Chandler, Mike's ex-wife. Mike initiated the divorce in 1997 and obtained custody of their children. At the time of the murders, Chandler lived in Denver, Colorado.

Topeka Police Department Sergeant Richard Volle called Chandler on July 7 to give the death notification. Her failure to ask certain questions, such as where Mike was when killed and if anybody else was murdered, struck Volle as suspicious. He obtained her phone and financial records. A nine-year investigation ensued.

*Timeline, arrest, and trial*

On July 11, 2002, Volle interviewed Chandler at her attorney's office while she was in Topeka for Mike's funeral. During that meeting Chandler gave the first explanation for her whereabouts on July 6 and 7. A police officer went to Denver on July 11 and 12 to search her apartment and investigate her alibi.

On July 15, 2002, Chandler was arrested in Topeka on a child support warrant. Her black Mitsubishi Eclipse was seized. The car had an Arizona license plate. No evidence linking Chandler to the murders was found in the car.

In August 2002, a $30 check forged on Mike's bank account was presented at a Kwik Shop. The investigation uncovered that Walt Rogers passed the check, and Terry Tignor had given it to Rogers. Both had extensive prior criminal records. At trial, a defense theory was that Mike and Karen were killed during a burglary and the police

failed to investigate similar burglaries in Karen's neighborhood. The check was drawn on a different bank account than the ones found in Karen's home.

Volle testified the investigation went cold around the end of 2002, although some efforts continued.

In May 2003, Chandler's hair was collected and compared with hair and fiber samples from the crime scene. The samples were not hers. Chandler eventually moved to Oklahoma.

In July 2011, the Topeka Police Department coordinated a two-week "surveillance gathering" in Oklahoma so that a "safe interview could be conducted and at a point after that a safe arrest could be made," as it was described by Topeka police detective Douglas Searcy. Police searched Chandler's home and her sister's home in Oklahoma. No evidence linking Chandler to the crimes was discovered. She was charged with two counts of premeditated first-degree murder. See K.S.A. 21-3401(a).

The State recorded Chandler's post-arrest jailhouse phone calls. And on the eve of trial, the State sent a limb hair discovered on a shell casing for comparison to known samples from Chandler and the victims. The test excluded all three as possible matches for the hair.

The trial was held in March 2012. There were 10 days of testimony during which the State called over 80 witnesses and had nearly 900 exhibits admitted into evidence. Yet despite this testimonial and documentary bulk, the State's case relied on limited circumstantial evidence:  (1) Chandler's inconsistent statements concerning her whereabouts on July 6 and 7, 2002; (2) her gas purchases on those days; (3) her obsessive

6

behavior toward Mike and Karen; and (4) two arguably incriminating post-arrest jailhouse phone calls.

The jury convicted her of both premeditated first-degree murders. At the sentencing hearing, the district court found Chandler knowingly and purposely killed more than one person and that the crimes were committed in a heinous, atrocious, and cruel manner. Those findings permitted the court at the time to sentence Chandler to two consecutive life sentences, each carrying a mandatory minimum 50-year prison term. See K.S.A. 21-4635.

We detail the State's evidence next because its strengths and weaknesses impact the outcome.

*Inconsistent statements concerning Chandler's whereabouts*

Receipts and credit card statements confirm Chandler was in Denver at 2 p.m. on July 6. Receipts also confirm she was in Loveland, Colorado, north of Denver, around 5 p.m. on July 7. She provided at least three explanations about where she was the 27 hours in between.

During her July 11, 2002, interview with Volle, Chandler said she left her house around 10 a.m., July 7, and drove through the mountains on I-70, travelling west towards Dillon, Colorado. She said she hiked near Granby and took Highway 34 to Estes Park. The State presented evidence Chandler did not know there was a lake near Dillon visible from the road. The State also presented evidence her car was not seen on video taken from the guard gates at Rocky Mountain National Park, through which she would have had to pass.

7

In July 2002, Chandler called an acquaintance and asked him for a referral for an attorney. During that conversation, she told him she was in Denver all weekend on July 6-7.

In August 2002, Chandler met in Denver with another acquaintance, Jeff Bailey, to ask for money for her defense. She told him she had lied to police about where she was because she did not think they would believe her. She gave Bailey a third account, telling him she bought gas in Denver and drove to Glenwood Springs, Craig, Steamboat, towards Fort Collins, and then back to Denver. He asked if she had seen smoke from forest fires he recalled from television reports. Chandler said no. The State presented evidence she would have seen smoke along this route.

The State produced evidence Chandler planned as recently as July 2 to come to Topeka on July 6 to pick up her son.

*Chandler's gas purchases*

On July 6, Chandler bought $21.28 in gasoline in Denver. She also purchased a cigarette lighter and two 5-gallon gas cans at a Denver AutoZone. Her next known gas purchase was at 5 p.m., July 7, for $24.10 in Loveland.

During the July 11, 2002 interview with Volle, Chandler mentioned buying the lighter, but not the gas cans. Police found a 5-gallon gas can with a "small amount of gas [in it], less than a cup" in her apartment during the July 11-12 search. The State produced evidence Chandler could not have driven from Denver to Topeka and back to Loveland without stopping for more fuel, even if she had both 5-gallon gas cans and her vehicle's full fuel tank.

But this was also too much gas to cover the shorter route through Colorado Chandler claimed to have taken. And there is testimony the gas purchases are inconsistent with the longer route she also said she took through Colorado, although it is unclear whether there was too much or too little gas for that. In her pro se supplemental brief, Chandler contends the longer route was 487 miles and within her vehicle's fuel capacity without using the 5-gallon cans.

Since Chandler's known gas purchases could not have fueled a trip to Topeka and back, police investigated whether she stopped along I-70 between Oakley and Topeka. In July 2002, Detective Michael Barron and another detective spoke to Patti Williams and Margaret Linden, who were WaKeeney Amoco station employees. Williams died before the preliminary hearing and trial. The State was not permitted to prompt Williams' hearsay testimony from other witnesses about what she may have said—a point repeatedly emphasized by the State at trial.

Linden was asked about a black Mitsubishi she said stopped at the station. She testified: "I saw, I believe it was—I thought it had been Colorado, but it wasn't. If my cashier was alive today she would tell you it was West Virginia or Virginia, one or the other." Linden continued that she went out and checked to make sure the driver hung up the pump because her cashier was worried about the driver "not paying the bill yet and buying certain different titled books of some sort." She again testified she thought the car had a Colorado tag, but that "was wrong." And she described the Mitsubishi Eclipse as "[s]mall, kind of small—medium sized, I would say, maybe." Detective Barron testified that when he interviewed Linden, she did not identify Chandler. He said Linden told him she thought the black Mitsubishi had a Virginia tag, but also told him the car had a Colorado tag.

9

The State called Marla Pfannenstiel, who worked with Williams and Linden. The court permitted the State to ask Pfannenstiel about how Williams behaved while talking to Detective Barron. Pfannenstiel testified Williams "was very meticulous in her job . . . [and] an observant cashier. . . . [S]he studied people." Pfannenstiel said Williams took officers over to a self-help book display and pulled some off a shelf. During this testimony the prosecutor prompted five times to the effect: "Now I want to be sure in my questions I'm not asking you what Patti said."

The prohibition on discussing Williams' statements came up again during Volle's testimony. The prosecutor asked if he talked to Amoco employees but instructed him not to "tell us what they said." He testified he talked to Williams and showed her a photo array.

The defense recalled Detective Barron to question him about Linden's car tag identification. On cross-examination, the prosecutor segued into testimony about Williams without drawing an objection. The prosecutor asked whether Barron spoke with Williams and admonished him, "You cannot tell us what . . . Williams said to you because she's since passed away. None of my questions—I'm not asking what Patti said to you. Okay?" Barron was then asked to describe what happened, and he said he showed Williams a photo array and she took him to a stack of books. The prosecutor reiterated to the officer "without telling us what Patti said" to describe the books. He said Williams handed him titles such as *Overcoming Hurts and Anger*, *Have You Felt Like Giving Up Lately*, and *The Weapons of Prayer*.

The State never presented documentation, like a receipt or credit card statement, to show Chandler purchased gas or anything else in WaKeeney.

10

*Chandler's obsessive behavior toward the victims*

The State admitted considerable evidence Chandler engaged in obsessive behavior toward Mike and Karen: (1) making numerous telephone calls to them; (2) verbally accosting them; (3) spying on them at their homes and in public places; (4) entering Mike's home without permission; and (5) trying to reconcile with Mike up to several weeks before the murders.

Chandler told police she only talked to Mike every few months, but contrary evidence showed that to be false. Alice Casey, an FBI crime analyst, testified Chandler placed 645 calls to Mike's home phone, Mike's cell phone, and Karen's home phone between January and July 2002. Some were episodes of "rapid calling." For example, on February 27, Chandler made 22 calls in 31 minutes to Mike's home. On April 19, she made 12 calls in 13 minutes to Mike's home. And on June 3, she made 17 calls in 18 minutes to Mike's home, his cell phone, and Karen's home. Casey testified that out of 269 days of subpoenaed records, only 12 days showed no phone activity, including July 6. Chandler had two calls on July 7.

Volle testified that on July 5, Chandler called Mike seven times, and the second call lasted five minutes. After that, Chandler called back five times.

Several witnesses testified about Chandler's other behavior toward Mike and Karen. For example, Chandler's daughter said Chandler would often show up at places she was not expected. The daughter described one instance when Chandler pulled up to their car after a theater performance to scream obscenities. She said Chandler would sometimes sit with the children in her car outside Mike's house during visitations.

Chandler's son testified he found her snooping through Mike's paperwork in the kitchen when she came to pick him up even though he expected her to wait outside. He said Chandler made the kids spy on their dad in 1999 or 2000 by sitting in the car outside Mike's home. And once after Mike and Karen started dating, Chandler drove from Lawrence to Karen's home in Topeka during a visitation, parked outside, and waited for an hour or two. Chandler and Mike got into an argument outside the home.

One of Karen's neighbors testified she saw a black Mitsubishi parked along the road sometime in the year before the murders. Another testified she observed a confrontation between Mike and Chandler two or three years before the murders. Chandler's car had been idling outside for a while; two kids were in the car. Chandler approached Mike and Karen when they arrived.

Mike's sister and brother testified Mike told them he returned home in May 2002 to find Chandler sitting inside the breezeway, and Chandler told Mike they should live together as a family.

About a month before the murders, Chandler told a friend she entered Mike's home through a window. She said Mike's house was filthy and asked if she should call child protective services. Chandler said she sat outside Karen's home, but drove back to Denver when Mike and Karen did not return.

*Chandler's post-arrest jailhouse phone calls*

About 12 hours of audio collected from Chandler's jailhouse phone calls were admitted into evidence, although nothing was played in the State's case-in-chief. In closing, the State used two calls between Chandler and her sister, Shirley Riegel, to argue for conviction. The first was recorded after a day when the State presented evidence at

12

the preliminary hearing. Chandler and her sister were happy with how things went. Chandler said her attorney said "they should cut me loose but they probably won't." Later, they discussed learning that Williams, the Amoco worker, had died and could not testify:

"[Chandler]:     [The prosecutor] hasn't said anything, but it kind of came up today. You know they keep wanting to talk about that Patti Williams?

"[Riegel]:        I don't know who that is.

"[Chandler]:     She is ah. Remember how we told you about that book in WaKeeney that they said I bought, in WaKeeney, Kansas; and I said I didn't.

"[Riegel]:        Oh, yeah, yeah that girl.

"[Chandler]:     At the Amoco station.

"[Riegel]:        Oh yeah, that girl.

"[Chandler]:     Well, anyway, she is dead.

"[Riegel]:        I know. That is huge for you. Yes, that is huge for you.

"[Chandler]:     And [the prosecutor] keeps trying to sneak in what she said because that you know little piece of information could potentially put me in Kansas. But that is the only thing.

"[Riegel]:        Well Dana, that witness that she tried to get to speak for her—

"[Chandler]:     Linden.

"[Riegel]:        Totally flubbed that up.

"[Chandler]:     I know.

"[Riegel]:        Tell me what. She didn't even work there at the time. I mean that totally screwed that testimony up. So if that is what they are leaning on—

"[Chandler]:     Uh, huh.

"[Riegel]:        I mean—

"[Chandler]:     Because they got to at least put me in Kansas. At least.

"[Riegel]:        Absolutely. Absolutely.

"[Chandler]:     Yeah, you know.

"[Riegel]:        I mean, I am feeling. Today was such a good day. I mean, I was just in awe."

13

The second call occurred a month before trial. Chandler and Riegel discussed whether the State would have DNA analysis done on the limb hair found on a shell casing:

"[Chandler]:  You heard about the hearing last week about the infamous hair.

"[Riegel]:  Yeah, well. I read it in the paper. I've been pulling up that Capital-Journal.

"[Chandler]:  So, anyway, the results on that DNA analysis is supposed to be back by the 5th of March. The day that the trial is supposed to start.

"[Riegel]:  Oh, really.

"[Chandler]:  Yeah.

"[Riegel]:  Well, good luck to them.

"[Chandler]:  Yeah. Well, they've got you know some of my hair.

"[Riegel]:  I know. I know Dana.

"[Chandler]:  The department has access to both the hair and my hair.

"[Riegel]:  Yeah, I know. I know. I've definitely thought about that.

"[Chandler]:  Yeah, I'm really surprised the judge even granted the motion to have that sent off to be tested quite frankly under the circumstances.

"[Riegel]:  Well, it is in the paper that there will be no, I don't guess, you know, if they take that one hair there won't be nothing left to it.

"[Chandler]:  Exactly. They have to consume the whole thing.

"[Riegel]:  Well, that just yeah. That was covered in the paper.

"[Chandler]:  So.

"[Riegel]:  Yep, you know, I'm sure."

*Appellate proceedings*

This court first had oral arguments in Chandler's appeal on January 27, 2016. After that, we granted her unopposed motion for new counsel and her motion to file a pro se supplemental brief. Replacement counsel was appointed in July 2016. The court received

14

supplemental briefing. We took these unusual steps because the circumstances indicated they were necessary to serve the ends of justice.

In the appeal's current posture, the defense: (1) renews an insufficient evidence argument; (2) renews prosecutorial error claims, while adding others; (3) renews a K.S.A. 60-455 argument about prior bad acts evidence; and (4) adds a cumulative error claim.

Chandler also challenges her two hard 50 sentences, arguing they were imposed in violation of the right to a jury trial under the Sixth Amendment to the United States Constitution. The State concedes the sentencing errors. See *Alleyne v. United States*, 570 U.S. 99, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013); *State v. Soto*, 299 Kan. 102, Syl. ¶ 9, 322 P.3d 334 (2014) (concluding hard 50 sentencing scheme permitting a judge—rather than a jury—to find aggravating circumstances necessary to impose an increased mandatory minimum sentence violates right to a jury trial under *Alleyne*).

Chandler's pro se supplemental brief contains 127 handwritten pages with attachments—many not in the record on appeal. She complains her requests for record additions were not fulfilled, material was not made available, and the district court failed to inform her of her right to present evidence at sentencing. She sets out her own account of her divorce; the facts surrounding the murders; the crime scene evidence; the State's investigation and her arrest, including the State's alleged misuse of the media; and the trial. These arguments go mainly to the evidence's weight, e.g., her behavior and its temporal proximity to the murders. Lastly, she supplements her attorneys' prosecutorial error arguments.

Chandler argues the State failed to produce sufficient evidence linking her to the murders. We consider this first because even though the conceded prosecutorial error discussed next warrants reversal, if the evidence during the first trial was insufficient to support the convictions, a second trial on the same charges would violate Chandler's right to be free from double jeopardy under the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution's Bill of Rights. See *State v. Jefferson*, 297 Kan. 1151, 1166, 310 P.3d 331 (2013); *State v. Hernandez*, 294 Kan. 200, 209, 273 P.3d 774 (2012). This discussion also serves as prelude to the reversibility analysis required by the State's prosecutorial error.

*Standard of review*

> "When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations." *State v. Lloyd*, 299 Kan. 620, 632, 325 P.3d 1122 (2014).

An appellate court must consider even erroneously admitted evidence from the first trial when reviewing a sufficiency challenge. *Jefferson*, 297 Kan. at 1166 ("Notably, even though we have determined that the district court erred in admitting [defendant's] videotaped statement, we must nevertheless consider that erroneously admitted evidence in reviewing the sufficiency of the evidence presented at the first trial."); see also *State v. Pabst*, 268 Kan. 501, 512, 996 P.2d 321 (2000) ("'[A] reviewing court must consider *all* of the evidence admitted by the trial court in deciding whether retrial is permissible under

the Double Jeopardy Clause.'" [Emphasis added.]) (quoting *Lockhart v. Nelson*, 488 U.S. 33, 41, 109 S. Ct. 285, 102 L. Ed. 2d 265 [1988]).

*Discussion*

The State must prove each element of an offense. Circumstantial evidence and the logical inferences properly drawn from that evidence can be sufficient to support a conviction even for the most serious crime. *Jefferson*, 297 Kan. at 1167.

First-degree premeditated murder is the killing of a human being committed intentionally and with premeditation. K.S.A. 21-3401(a). To secure her convictions, the State had to prove Chandler intentionally killed Mike and Karen, that the killings were done with premeditation, and that the acts occurred on or about July 7, 2002, in Shawnee County. The question is whether sufficient evidence existed to establish Chandler was the person who killed Mike and Karen. To that end, the State's case relies on: (1) her inconsistent statements for her whereabouts on July 6 and 7, 2002; (2) her gas purchases on those days; (3) her obsessive behavior toward the victims; and (4) the two post-arrest jailhouse phone calls.

The State's case was founded on inferences—a point Chandler repeatedly emphasizes. For example, Detective Volle testified that on July 5, 2002, the records showed she called Mike seven times, with the second call lasting about five minutes. But there was no evidence about the substance of that five-minute call. Nevertheless, the prosecutor said during opening statement, "Mike at this time *told the defendant in that five-minute phone call that he and Karen were going to be married*, that the two were engaged and planned to be married." (Emphasis added.) And again in closing statement the prosecutor remarked, "After that five-minute conversation *where Mike told [Chandler] he was engaged*, she calls five more times to his home and to his cell."

17

(Emphasis added.) The State's theory was that this five-minute call spurred Chandler to murder two days later.

Chandler argues the State's assertion that Mike told Chandler about the engagement on July 5 is unsupported by any evidence, so an insinuation that news of the engagement caused her to drive to Topeka to commit murder is impermissible inference stacking. She argues this was especially damaging because "there are no facts in evidence that would otherwise lead the jury to conclude that Chandler would go from living her life in Denver . . . to driving hundreds of miles to shoot [Mike] and [Karen]."

Curiously, the State tries to deflect this point by referring to two witnesses who said Mike actually told Chandler about the engagement months earlier in May 2002. From that, it argues the evidence established Chandler knew about the planned marriage so no inference was needed. But that sleight of hand does not reasonably justify the prosecutor telling the jury Mike informed Chandler about the engagement on July 5, let alone that this supposed news provoked her to murder two days later.

Presumptions and inferences may be drawn from established facts, but a presumption may not rest on presumption or inference on inference. In other words, an inference cannot be based on evidence that is too uncertain or speculative or that raises merely a conjecture or possibility. *State v. Burton*, 235 Kan. 472, Syl. ¶ 3, 681 P.2d 646 (1984). Reasonable inferences "cannot be drawn from facts and conditions merely imagined or assumed." 235 Kan. at 477.

But whether the State's reasoning, i.e., that Mike told Chandler about his engagement on July 5 and this caused her to murder Mike and Karen on July 7, requires inference stacking is a different question from whether her convictions rest on inference stacking. In assessing the evidence's sufficiency, we consider all the evidence at the jury's

18

disposal. *Lloyd*, 299 Kan. at 632. And while Chandler's inference stacking argument zeroes in on one piece of motive evidence, there was more, and our analysis must include that evidence—even though it was improper to attribute content to that five-minute phone call without any proof.

The State showed Mike and Chandler had a long, bitter divorce. Mike was granted custody of their children and she was forced to move from the marital home and pay child support. The State cites testimony she arrived at places uninvited, insulted the victims, and wrote her daughter instant messages and an email expressing hatred for Mike. And the State argues jealousy was the only logical motive for the crimes because "all of the law enforcement personnel who investigated the crime concluded the motive appeared to be murder and not a burglary, robbery, drugs, or sexual assault." The State cites evidence Chandler entered Mike's home without permission the month before the homicides.

The State also argues Chandler had an opportunity to commit the crimes. It notes she gave inconsistent statements about her calling history and whereabouts when the murders occurred. It points to evidence suggesting her presence at the WaKeeney Amoco station on July 6, 2002, i.e., Margaret Linden's testimony that a black Mitsubishi with out-of-state license plates refueled there and Patti Williams' reaction when shown Chandler's photo. Finally, the State refers to the two jailhouse phone calls:  one suggested Chandler and her sister might be happy Williams could not testify at trial, while the other showed Chandler's possible anxiety about the State testing another hair found at the crime scene.

The State refers to *State v. Flynn*, 274 Kan. 473, 55 P.3d 324 (2002), for its similarities concerning the modest amount of circumstantial evidence that can support a premeditated first-degree murder conviction. In *Flynn*, the court held sufficient evidence

19

existed even though none linked the defendant to the crime scene. 274 Kan. at 485-86. It established motive because Flynn was in a child custody dispute with the victim from which she "needed a way out" due to unfavorable developments in the case. 274 Kan. at 484. The court noted shortly before the murder Flynn threatened another man over a custody dispute and her codefendant, her brother, threatened the victim. In addition, Flynn had an opportunity to commit the crime because she left work early the day of the murder, purchased gas, and arranged for someone to pick up her children. And she engaged in suspicious post-murder conduct by twice driving her car through an automatic car wash, which permitted an inference that the car was soiled with the victim's blood or dirt from the road. Finally, Flynn commented after the murder that the victim was "an evil, wicked man who deserved to die." 274 Kan. at 486. Somewhat similarly, Chandler had motive and opportunity, and engaged in suspicious behavior after the murders.

As to motive, the evidence supports a conclusion that in the years during and after the divorce, Chandler exhibited obsession with Mike, Karen, and their relationship. That behavior can be characterized as "increasing" during the time leading up to the murders, as there was evidence it escalated from harassing, following, and telephone calls to uninvited entry into Mike's home as recently as several weeks before the crimes. As to opportunity, her whereabouts were unconfirmed. She made suspicious gas purchases, including the two 5-gallon gas cans, a detail she omitted from her first police interview. The State also produced evidence suggesting she was not where she said she was when the killings occurred. This undermined her statements and tended to show she was in Kansas on July 6.

Her inconsistent statements also constitute suspicious post-murder conduct demonstrating consciousness of guilt. See *State v. Norwood*, 217 Kan. 150, 155, 535 P.2d 996 (1975) ("False exculpatory statements by a defendant are admissible to show consciousness of guilt and unlawful intent. . . . 'The fact that a defendant in a criminal

20

case resorts to a falsehood is a circumstance which may, in connection with other facts in the case, tend to prove guilt.'"). Similarly, viewing the evidence in a light most favorable to the State, the jury could have interpreted the second jailhouse phone call as expressing apprehension that law enforcement might match Chandler's hair to one found at the crime scene. And unlike other statements argued to be inculpatory, in a light most favorable to the State there is a difference between expressing frustration about the judge allowing testing on the eve of trial and a more particularized concern the State had her hair for comparison.

Our standard of review and the caselaw applying it set a rather low bar under similar facts. We hold sufficient evidence exists when viewed in the light most favorable to the State, such that a rational factfinder could have found the defendant guilty beyond a reasonable doubt of the crimes charged.

PROSECUTORIAL ERROR

Several claims involving prosecutorial error arise in Chandler's appeal. Most come from the supplemental briefing and inquiries by the court. See *Tolen v. State*, 285 Kan. 672, 675-76, 176 P.3d 170 (2008) (authority for *sua sponte* consideration of new issues or arguments resulting from the court's questioning). We address several because they might otherwise reoccur, but emphasize only the one conceded error was enough to reverse these convictions—the prosecutor falsely claiming Mike got a protection from abuse order against Chandler from the Douglas County District Court.

*Standard of review*

When the parties first argued this appeal, Kansas courts referred to claims that a prosecutor's comments denied a defendant's due process rights to a fair trial as "prosecutorial misconduct." See, e.g., *State v. Barber*, 302 Kan. 367, Syl. ¶ 4, 353 P.3d 1108 (2015). The then-effective standard of review was a two-step analysis set out in *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004).

Under *Tosh*, an appellate court decided first whether the prosecutor's remark being complained about was outside the wide latitude allowed in discussing evidence. 278 Kan. at 85. If so, the court made what was described as a "particularized harmlessness inquiry," assessing: (1) whether the misconduct was gross and flagrant; (2) whether it showed ill will on the prosecutor's part; and (3) whether the evidence against the defendant was of such a direct and overwhelming nature that the misconduct likely had little weight in the jurors' minds. 278 Kan. at 93. No factor individually controlled, but before the third could override the first two, an appellate court had to be able to say the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), were met. 278 Kan. 83, Syl. ¶ 2.

After the first oral arguments, this court articulated a modified two-step analytical framework for claims that a prosecutor's trial behavior requires reversal. See *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016). *Sherman* renamed these claims "'prosecutorial error,'" saving the pejorative "'prosecutorial misconduct'" label for more egregious transgressions. 305 Kan. at 90, 114 ("Prosecutorial acts properly categorized as 'prosecutorial misconduct' are erroneous acts done with a level of culpability that exceeds mere negligence.").

*Sherman* did not disturb the preexisting standard for whether the prosecutorial action complained about was improper, i.e., the action was outside the wide latitude afforded prosecutors. 305 Kan. at 104 ("The well-developed body of caselaw defining the scope of a prosecutor's 'wide latitude' . . . will continue to inform our review of future allegations of prosecutorial error."). But under *Sherman*:

"If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.] We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]" 305 Kan. at 109.

The *Sherman* court also noted,

"Multiple and varied individualized factors can and likely will affect the *Chapman* analysis in future cases. Every instance of prosecutorial error will be fact specific, and any appellate test for prejudice must likewise allow the parties the greatest possible leeway to argue the particulars of each individual case. Thus, appellate courts should resist the temptation to articulate categorical pigeonholed factors that purportedly impact whether the State has met its *Chapman* burden. Appellate courts must simply consider any and all alleged indicators of prejudice, as argued by the parties, and then determine whether the State has met its burden—*i.e.*, shown that there is no reasonable possibility that the error contributed to the verdict. The focus of the inquiry is on the impact of the error on the verdict. While the strength of the evidence against the defendant may secondarily impact this analysis one way or the other, it must not become

23

the primary focus of the inquiry. As has often been repeated, prejudice can exist even 'in a strong case.' [Citation omitted.]" 305 Kan. at 110-11.

Because Chandler's appeal is not yet final, *Sherman* applies. See *State v. Mitchell*, 297 Kan. 118, Syl. ¶ 3, 298 P.3d 349 (2013) (change in law applies to cases pending on direct review and not yet final on date of appellate court decision). The parties had the opportunity to address *Sherman* in their supplemental briefs and discuss it at oral argument. That said, the result would have been the same under the pre-*Sherman* test.

*False claim about a protection from abuse order*

All agree there is no protection from abuse order in the trial record. Yet, during closing argument, prosecutor Jacqueline Spradling told the jury:

"How else do we know the defendant is guilty? *Mike got a protection from abuse, a court order.* He applied and said, hey, Judge, please order this woman to stay away from me *and the Judge agreed.* And in 1998, meaning one year after he filed for the divorce, he was continuing to have problems with the defendant not leaving him alone. *So he got a court order saying she has to stay away. The protection from abuse order did not stop the defendant, though.*" (Emphases added.)

These misstatements conveyed serious adverse impressions to the jury. They improperly declared that a judge independently reviewed Chandler's behavior and concluded she was dangerous enough to justify a court order for Mike's protection. They also told the jury Chandler was so out of control that she violated that court order, i.e., accuses her of wrongdoing that would constitute "prior bad acts" if presented as evidence. See K.S.A. 2017 Supp. 60-455 (subject to specific exceptions, evidence a person committed a crime or civil wrong on a specified occasion is inadmissible as basis to infer

24

the person committed another crime or civil wrong on another specified occasion). None of this was true.

In its final supplemental brief, the State acknowledges "the prosecutor misspoke when she informed the jury that [Mike] Sisco had obtained a 'protection from abuse, a court order.'" But that concession, while laudable, was a long time coming—even though we would expect the State never to shield something so obviously indefensible. The State's journey to this admission deserves some additional chronicling.

In its initial briefing, the State brazenly wrote, "While Defendant proclaims that there was no protection from abuse order, *the record shows otherwise*." (Emphasis added.) The State further represented in that brief: "*Sisco was granted a protection from abuse order in 1998*." (Emphasis added.) These statements were not true.

At the first oral argument, the court challenged these misrepresentations and the State's position shifted. Initially, the State allowed it was simply a mistake to have said "protection from abuse" order, stressing the prosecutor should have just said "protective order." The State then claimed there were two such "protective orders" in the divorce case: (1) an initial, routine, temporary ex parte order directed to both Mike and Chandler to keep them from "contacting, bothering, harassing or molesting each other in any manner whatsoever, wheresoever . . . pending the final hearing of this matter"; and (2) an October 1998 order in the divorce case directed specifically against Chandler. The State further explained that a detective testified about the October 1998 order's existence, but left out of this explanation how the detective contradicted that testimony in cross-examination by conceding he had no recollection of any such protective order. And when this court insisted there was no 1998 order in the record, the prosecutor finally justified that as perhaps something she thought to be true even though it was not in the evidence.

25

These misstatements and misdirection cause even greater concern on closer consideration. For example, the record strongly suggests the prosecutor knew there was no protection from abuse order (or even a 1998 "protective" order) before asking the detective about it on the stand. As recently as about a month before trial, the State accurately described in pleadings what the divorce file contained when asking permission to introduce evidence that Mike *sought* a restraining order. The State's written motion, signed by the same prosecutor who questioned the detective at trial, who misstated the evidence during closing, and who represented the State in the first oral arguments to this court, stated:

> "Mike Sisco *requested* an immediate restraining order on October 15, 1998, indicating that this defendant intentionally, maliciously, and repeatedly followed and harassed him, destroyed personal property of his acquaintances and had engaged in telephone harassment." (Emphasis added.)

Notably, this motion did not allege any court order resulted from Mike's request, nor did it seek permission to admit such an order into evidence—something the State surely would have done if it had a good faith belief this order really existed. But there is more.

The State's questioning of the detective about a "protection from abuse" order supports a conclusion this was preplanned. The trial transcript reflects:

> "Q [Prosecutor]: To your knowledge, did either of the Basgalls ever jump on Mike's trampoline in the middle of the night?
> "A [Volle]: No.
> "Q: Did either Mike or Karen say they were afraid of the Basgalls?
> "A: No.
> "Q: Did either of the Basgalls to your knowledge stalk Mike or Karen?

26

"A: No.

"Q: Either of them harass Mike or Karen?

"A: No, they did not.

"Q: Either of them try to prevent the relationship of Mike and Karen?

"A: No.

"Q: *Did either Mike or Karen get a protection from abuse against the Basgalls?*

"A: *No.*

"Q: *Will you tell the jury what a production [sic] from abuse or PFA is[?]*

"A: *It's a document signed by the Court that says you are not able to have contact with another person, you're not supposed to call them, write them, contact them in any manner.*

"Q: *A court order precluding one person from contacting another?*

"A: *Yes.*

"Q: *Did Mike get a protection from abuse?*

"A: *Yes, he did.*

"Q: *Against who?*

"A: *Against the defendant.*

"Q: *In 1998?*

"A: *That's correct.*

"Q: *Did Mike get a PFA or protection from abuse against anybody other than the defendant?*

"A: *No one else.*" (Emphasis added.)

The above belies the State's assertions that references to a "protection from abuse" order in its closing were somehow a slip of the tongue or the product of counsel's confusion given the trial record's hefty volume. The prosecutor specifically and intentionally referred to "protection from abuse" orders—not just routine, ex parte temporary orders often entered initially in divorce cases and directed to both parties. And this is further underscored by the reasonable assumption that experienced prosecutors know the difference and understand that protection from abuse orders are specific

27

creatures under state law, entered after judicial review, and based on specific evidence in separate court proceedings. See Protection from Abuse Act, K.S.A. 60-3101 et seq.

Also puzzling is why this nonexistent order would even be mentioned in closing after the detective was challenged about it by defense counsel and could not confirm its existence:

> "Q [defense counsel]: Was it actually signed by a judge and filed or was it a motion or a request for one that wasn't—
> "A [Volle]: *I don't recall*." (Emphasis added.)

The detective admitted he could not say any such order existed, which put the prosecutor on notice that the detective's testimony could not establish this as fact. And this makes it further confounding why the State during its first oral argument would represent to this court that the detective's testimony established the order's existence when it most certainly did not.

Finally, there can be no pretext by which the prosecutor confused a made-up "protection from abuse" order with the only order in the divorce file—the temporary order directed to both parties. The State argues in its supplemental brief: "It is possible the prosecutor thought she was referring to the correct order since there were several documents referring to a restraining order admitted into evidence." This is an untenable position.

Even if the prosecutor was meaning to reference the initial ex parte order, her statement would remain seriously misleading because she did not mention the order was routine, temporary, or directed to both parties. These are critical distinctions. Instead, the prosecutor made it appear Chandler was the order's target and her behavior the reason for

28

the judge to enter it—none of which would have been true, even if the prosecutor got mixed up. And the State's speculation about possible confusion ignores the specific "protection from abuse" references made in questioning the detective and the timeline presented, i.e., one year after Mike filed for divorce.

This court cannot understand why so much energy had to be expended by all concerned to get us to the State's belated admission about something that never existed in the trial record. Nevertheless, the concession establishes the first element of the prosecutorial error test, i.e., action outside the wide latitude afforded to prosecutors. See *State v. Hall*, 292 Kan. 841, 848, 257 P.3d 272 (2011) (when prosecutors argue facts not in evidence, the argument is outside the wide latitude given to them). We explain next why this error prejudiced Chandler's due process right to a fair trial and requires reversal.

*Reversibility*

As mentioned, we apply the harmless error test from *Chapman*, 386 U.S. 18. *Sherman*, 305 Kan. at 109. Having benefitted from the error, the State has the burden to show there is no reasonable possibility that error contributed to the verdict.

The State argues any "protection from abuse" reference was not critical and that "strong circumstantial evidence established motive and opportunity." It notes the jury was instructed to disregard statements unsupported by evidence and reasons "[t]he fact that the prosecutor made an inadvertent error, during a lengthy closing argument summarizing 86 witness[es'] testimony and hundreds of exhibits does not amount to reversible error." The State contends "[t]here is no likelihood that the verdict would be different had the prosecutor not made the comment." And in its original brief, the State argued simply that "[a]lthough the evidence was circumstantial, there was overwhelming evidence presented."

29

Our previous discussion about the evidence's sufficiency calls into question the State's argument that it presented overwhelming evidence of guilt, even though it was sufficient under our standard of review to convict. And the State's assertion that there is "no likelihood that the verdict would be different had the prosecutor not made the comment" tries to substitute a different test. Prejudice can exist even in a strong case. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 240, 60 S. Ct. 811, 84 L. Ed. 1129 (1940); *Sherman*, 305 Kan. at 111 ("The focus of the inquiry is on the impact of the error on the verdict. While the strength of the evidence against the defendant may secondarily impact this analysis one way or the other, it must not become the primary focus of the inquiry.").

In *State v. Akins*, 298 Kan. 592, 601-05, 315 P.3d 868 (2014), the prosecutor improperly bolstered the State's evidence in a sex abuse case by gratuitously—and falsely—telling the jury about a court decision that supposedly contradicted a defense expert and argued without evidentiary foundation that defendant "groomed" the victims for abuse. As in Chandler's case, the *Akins* prosecutor's false characterization of a court decision as supporting authority "essentially implies that this aspect of the prosecutor's case . . . already had judicial approval." 298 Kan. at 601. The court held the improprieties required reversal, reasoning that the misconduct

> "was not ameliorated by evidence which was so overwhelming that the misconduct could not have influenced the jury's decision. There was no physical evidence of [defendant's] guilt, and he consistently and steadfastly maintained that he was innocent. So the jury was charged with deciding the case based on the testimony of witnesses, making their credibility of paramount importance." 298 Kan. at 613.

In *State v. Pabst*, 268 Kan. 501, 511, 996 P.2d 321 (2000), the court reversed a first-degree murder conviction when the prosecutor told the jury the defendant lied, and

30

argued, inaccurately, that the jury "'heard him agree that if he—this jury found that he lied, then you would find him guilty of first degree murder. He agreed with that. So you have to believe him. *If you don't believe him, then he's guilty. And he admits it*.'" The court reasoned:

> "The jury could have found, based on the physical evidence, that Pabst was guilty. However, the jury also might have decided Pabst was guilty because the prosecutor told it Pabst was lying, and if he was lying, it could convict him. Evidence of premeditation was sufficiently convincing under our standard of review, but not overwhelming. We therefore hold that the cumulative nature of the prosecutor's errors, coupled with the action of the district court in overruling Pabst's timely objection to the accusations of lying, requires a reversal." 268 Kan. at 511.

In *State v. McBride*, 307 Kan. 60, 71-72, 405 P.3d 1196 (2017), the court held in a credibility contest that the prosecutor committed reversible error by improperly bolstering the complaining witness' testimony when, after pointing out the defendant enjoyed a presumption of innocence, the prosecutor asked "'doesn't [the victim] deserve a certain presumption as well?'" The court reasoned the evidence against McBride was "not a strong case" due to a lack of corroboration and that the improper comment "reasonably could have caused the jury to accept [the victim's] testimony in the absence of anything else to support it." 307 Kan. at 72. And it noted a previous jury was unable to reach a verdict on the same evidence. 307 Kan. at 72.

In Chandler's case, there is no direct evidence of guilt, unlike in *Akins* and *McBride*. As in *Pabst*, the circumstantial evidence is sufficient, but not overwhelming. The record has no physical evidence tending to place Chandler at the crime scene. The State's route to conviction rested on convincing the jury she had an opportunity to commit the crime and that her obsessive and sometimes criminal behavior escalated to murder. The State produced evidence it was possible for Chandler to have been in

31

Topeka on July 6, but the key question for the jury remained whether she did commit the killings. The false statements about this made-up protection from abuse order helped the State fill in the blanks to its narrative.

This case is analogous to *Akins*, *Pabst*, and *McBride* in that the error intruded into the jury's decision on paramount elements to the State's theory. The prosecutor traded on an untrue statement about a protection from abuse order. And this carried with it the incendiary assertion realized from another untruth that an independent judge validated Mike's fear that Chandler was dangerous, capable of inflicting harm, and so uncontrollable that judicial intervention was required for Mike's protection. The prosecutor then piled on with yet another falsehood—that Chandler violated this fictional order.

In *In re Care & Treatment of Foster*, 280 Kan. 845, 127 P.3d 277 (2006), a decision rendered six years before Chandler's trial, the court held it was reversible error for the State's counsel to argue some aspect of its case had judicial approval. The *Foster* court noted the State's attorney *truthfully* advised the jury that a judge had determined there was probable cause to believe Foster was a sexually violent predator. 280 Kan. at 858. But despite the statement's accuracy, the court held, it was reversible error because it "'stack[ed] the deck.'" 280 Kan. at 857. The court observed "an attorney's reference to a judge's *prior decision* supporting the attorney's case can certainly influence a jury to the extent that reversal is required." 280 Kan. at 859. It ordered a new trial despite "admittedly strong evidence against Foster." 280 Kan. at 861.

Our court has long recognized juries "can be easily influenced by the slightest suggestion coming from the court, whether it be a nod of the head, a smile, a frown, or a spoken word." *State v. Wheat*, 131 Kan. 562, 569, 292 P. 793 (1930); see also *Foster*, 280 Kan. at 857-58; *State v. Plunkett*, 257 Kan. 135, 137, 139, 891 P.2d 370 (1995) (noting

trial judges should be the exemplar of dignity and impartiality and discussing their influence on a jury); *State v. Hamilton*, 240 Kan. 539, 545, 731 P.2d 863 (1987) (discussing impact of a trial judge's statements and conduct on a jury in a criminal proceeding) (quoting *Wheat*, 131 Kan. at 569); *State v. Boyd*, 222 Kan. 155, 159, 563 P.2d 446 (1977) (discussing the trial judge's influence); *State v. Winchester*, 166 Kan. 512, 518, 203 P.2d 229 (1949) ("A juror is prone to watch any indication by the judge as to how he regards any part of the testimony or the credibility of a witness and for that reason a trial judge must scrupulously avoid the slightest indication as to his personal feelings concerning the matter in issue.").

In Chandler's case, the prosecutor apparently understood the value of feigning judicial endorsement for the State's theory about Chandler's uncontrollable dangerousness. The prosecutor used the word "judge" twice, the term "court order" twice, and the word "order" once in the five-sentence span following her rhetorical question, "How else do we know the defendant is guilty?" The prosecutor might just as well have said: "How else do we know the defendant is guilty? Because a judge has told us so." Even more prejudicially than in *Foster*, Chandler's prosecutor used an untruth about judicial approval to stack the deck.

The State's final effort to minimize its misrepresentations is to deflect responsibility. First, it asserts its misstatements must not have been too bad because the trial judge did not intervene to correct them, noting a trial judge has an independent responsibility to guard the defendant's right to a fair trial. See *State v. Ruff*, 252 Kan. 625, 634-35, 847 P.2d 1258 (1993) (trial judges have a duty "to interfere in all cases, on their own motion, where counsel forget themselves so far as to exceed the limits of professional freedom of discussion."); see also *State v. Wilson*, 188 Kan. 67, 73, 360 P.2d 1092 (1961). But this cannot end our reversibility analysis because nearly every error determined in an appeal is one that escapes the trial judge. See *Ruff*, 252 Kan. at 635-36

33

(rejecting State's claim that trial judge was in a far better position to assess prosecutor's conduct than an appellate court). And there is no authority for diminishing the prejudice caused from prosecutorial error by blaming the trial judge for not catching the State in the act red-handed.

Similarly, the State claims any significance to its error is weakened by the lack of a defense objection. But even if a failure to object somehow establishes defense counsel did not recognize the misstatements in real time, counsel's perception is a different question than whether the misstatements impacted the jury's verdict once they occurred. We do not require defense objections during the State's closing to preserve error claims. *State v. Martinez*, 290 Kan. 992, Syl. ¶ 10, 236 P.3d 481 (2010).

Third, the State notes the jury was instructed to review the evidence and argues had it done so it would have seen there was no protection from abuse order and disregarded what the prosecutor said. This is both unrealistic and unavailing. The State inundated the jury with thousands of exhibit pages, including 1,200 pages of divorce records. This mass of divorce pleadings—necessary or not for the prosecution—was not explained to the jury except when the State asserted in closing that somewhere in the pile was this imaginary protection from abuse order.

To expect any lay jury to unmask the State's falsehoods under such circumstances is too much. Worse yet, accepting its premise would abdicate the prosecutor's obligations as an officer of the court. *Ruff*, 252 Kan. at 636 ("The prosecutor is under a duty to insure that only competent evidence is submitted to the jury. Above all, the prosecutor must guard against anything that could prejudice the minds of the jurors and hinder them from considering only the evidence adduced."); *State v. Majors*, 182 Kan. 644, 647-48, 323 P.2d 917 (1958) ("It is the duty of a county attorney in a criminal prosecution to see that the state's case is properly presented with earnestness and vigor and to use every

34

legitimate means to bring about a just conviction, but he should always bear in mind that he is an officer of the court and as such he occupies a quasi-judicial position whose sanctions and traditions he should preserve."); see also *Pabst*, 268 Kan. at 510-11 (discussing a prosecutor's influence as a servant of the law and representative of the people of Kansas, jury may be misled into thinking prosecutor's statements are validated by the weight of the State of Kansas). A criminal prosecution is not a game of hide-and-seek for the jury to have to play.

The irony, of course, is apparent. The State bannered these provocative misrepresentations by proclaiming, "How else do we know the defendant is guilty?" Now, having conceded its error, the State has the burden to explain how these false claims about evidence it said would answer that key question could reasonably not have contributed to the resulting guilty verdicts. For the reasons explained, we hold the State failed to meet its burden. We reverse Chandler's convictions and remand the case to the district court for further proceedings.

OTHER PROSECUTORIAL ERRORS

Our decision to reverse due to the acknowledged prosecutorial error makes it unnecessary as a practical matter to consider additional errors claimed, but we will discuss some to avoid their repetition. See *Foster*, 280 Kan. at 857. We will not perform a prejudice analysis because that is moot at this point.

*Claiming Chandler drove to Nebraska*

During its opening statement, the State explained its evidence would show:

"Somewhere along that route, probably around Salina, the defendant would have had to have used the ten gallons of gas that were in the two five-gallon gas cans she purchased at the AutoZone before she committed the murders. The defendant's actual route included that she went from Denver to Topeka, Mike and Karen's house, and after killing both Mike and Karen in an interest to get out of the state as quickly as she could, *she drove directly up to Nebraska. After she gets to Nebraska, she turns around and goes home heading towards Denver.* This route matches the defendant's gas purchases and the defendant's gas consumption by her credit card receipts. It is the only route that matches that she's attributed to. Meaning, what we know she bought in gas is not consistent with what she told Detective Volle she did. It is not consistent with what she told Jeff Bailey she did the weekend of the murder." (Emphasis added.)

During trial, no evidence was admitted supporting the State's opening statement that Chandler fled to Nebraska and drove from there back home to Colorado. The district court sustained an objection when the prosecutor asked Volle whether "there [is] a route other than going east that would have taken a person out of Topeka into another state that's the quickest route to get out of Kansas." That objection was on the grounds there was no evidence Chandler went north, south, or any other direction, so the question solicited "nothing but speculation, conjecture and a wild guess."

In response, the prosecutor explained:

"Your honor, what I'm trying to explain is that if a person heads north, they can get out of [the] state into Nebraska, and it may be that I asked it inartfully, but I will not be asking for a route, only that heading north out of Topeka you get out of the state."

36

The questioning resumed with no inquiry about the gas required to get to Nebraska, that heading to Nebraska was the quickest route out of Kansas, or—more importantly—that Chandler drove to Nebraska. In other words, there was nothing supporting the factual representation that "she drove directly up to Nebraska. After she gets to Nebraska, she turns around and goes home heading towards Denver." This was obviously never anything but conjecture.

The court observed in *Miller v. Braun*, 196 Kan. 313, 317, 411 P.2d 621 (1966):

> "'It is generally held that statements by counsel that certain evidence will be introduced are not improper if made in good faith and with reasonable ground to believe that the evidence is admissible, even though the intended proof referred to is afterward excluded. However, in the absence of good faith, or where prejudice is clearly produced, whether as the result of accident, inadvertence, or misconception, the rule is to the contrary.'" (quoting 53 Am. Jur., Trial § 456, p. 358).

In *State v. Love*, 305 Kan. 716, 387 P.3d 820 (2017), the court confirmed counsel is accountable for what is said in opening, explaining:

> "The 'opening statement has a narrow purpose and scope. It is not evidence; and it is given only to assist the jury in understanding what each side expects its evidence to establish and to advise the jury what questions will be presented for its decision.' [Citation omitted.] Generally speaking, counsel may outline in opening statement what is expected to be proved 'unless it is manifest that such proof would be incompetent, or the statement is made for the purpose of creating prejudice.'" *Love*, 305 Kan. at 728 (quoting *Miller*, 196 Kan. at 317).

The *Love* court held there was no prosecutorial error when the prosecutor told the jury two doctors who treated a child for fatal injuries resulting from child abuse would testify that the child's mother—defendant's girlfriend—"'was acting "appropriately" and

37

being "cooperative."'" 305 Kan. at 727. At trial, the doctors testified as outlined by the prosecutor, and defendant did not object. The court concluded improper witness commentary on the mother's credibility by expressing a personal opinion on her "'appropriateness'" or "'cooperativeness'" was not manifest in the expected testimony because on its face it went to the mother's demeanor during her interactions with the two doctors. 305 Kan. at 728-29.

But the State's opening in Chandler's case was different. The prosecutor told the jury something as fact that had no basis, i.e., "she drove directly up to Nebraska. After she gets to Nebraska, she turns around and goes home heading towards Denver." And the prosecutor's supposed Denver-via-Nebraska itinerary was apparently premised on the flimsy notion the detective could testify a person driving north from Topeka will eventually cross into Nebraska and that this would be enough evidentiary foundation for the statements made.

Reasonable inferences "cannot be drawn from facts and conditions merely imagined or assumed." *State v. Burton*, 235 Kan. 472, 477, 681 P.2d 646 (1984). We hold there could be no reasonable good-faith basis for the prosecutor to believe there was substantive evidence to connect Chandler to Nebraska as was represented. It was error to include this in opening statement.

A related problem infected the closing when the prosecutor said:

"What these two gas cans [do] match up with is it gives her enough fuel to get from Denver to Topeka to do the killing *and get out of the state*. That's the significance of the gas cans. Otherwise her 27-mile-per-gallon can't be done." (Emphasis added.)

38

During the first oral argument before this court, the State admitted the italicized comment refers to the prosecutor's theory that Chandler left Topeka and drove north to Nebraska. Two problems are obvious. First, the statement flouts the trial court's earlier ruling that evidence of this theory was too speculative and inadmissible. Second, it is contrary to the record because no evidence was admitted supporting it. It was prosecutorial error to repeat this theme in closing.

*False claims about Internet searches*

In her pro se supplemental brief, Chandler challenges the prosecutor telling the jury in opening statement that KBI computer analyst John Kite would testify Chandler "accessed articles on CJ Online *that dealt with how to defend against murder charges and articles that dealt with sentencing in murder charges*." (Emphasis added.) Chandler correctly points out Kite gave no such testimony. The State does not address this in its supplemental briefing.

At trial, when asked about Chandler's Topeka Capital Journal online searches, Kite said he only found "HTML fragments that produced search results for CJ online that had related articles about the homicide and the investigations into them" and "a story which was the one-year anniversary story." Curiously, the State's direct examination of Kite never tried to elicit testimony that Chandler searched for information about how to defend against murder charges or sentencing in murder cases. This failure to inquire indicates a lack of any reasonable good-faith basis for the prosecutor to make these claims in opening.

Adding to the factual inaccuracy Chandler identifies, the prosecutor began her remarks about Kite's testimony by saying "he had found some things that had been done by the defendant on [her] work computer but thereafter deleted." The prosecutor did not

39

say when this occurred, i.e., before or after the crimes. The Topeka Capital Journal articles to which Kite referred all related to Mike's and Karen's murders, so those particular searches must have occurred after the crimes. Kite admitted on cross-examination he found nothing "significant to [him] that occurred prior to July 7, 2002."

But without context, a juror could easily construe the prosecutor's misstatements as suggesting Chandler did these things in preparation for murder, amplifying the impact of the State's motive evidence. We hold it was error for the prosecutor to tell the jury in opening statement that a State witness would testify Chandler searched for information about how to defend against murder charges or sentencing in murder cases.

*Arguments about Chandler outsmarting others*

During closing argument, the prosecutor said:

"[T]he lack of forensic evidence is proof of premeditation. She planned it in advance. You know why, you heard the evidence, *she's smart, she's got high intelligence and she thought she was smarter than the police department and she thought she was smarter than the jurors* and it's not true, because we are lucky enough to have law enforcement officers who didn't torture her. She's still playing the victim. They wanted justice. And we have you. *She's not smarter than the cops, [and] she's not smarter than you*." (Emphases added.)

Chandler asserts the italicized statements were error. She notes there was no evidence she had "high intelligence," although she concedes a witness testified her intelligence is "'probably above average.'" More importantly, Chandler argues there was no evidence she thought she was smarter than the police department or jury. And the State provides no justification for this. Evidence indicating Chandler's intelligence may

40

be above average does not support an inference she thought she was smarter than the police or jury.

But beyond this obvious problem, the commentary suggests the jurors should take Chandler's behavior as a personal affront. As she correctly points out, "The only purpose of the prosecutor's comment was to inflame the jury."

"The wide latitude permitted a prosecutor in discussing the evidence during closing argument in a criminal case includes at least limited room for rhetoric and persuasion, even for eloquence and modest spectacle." *State v. Carr*, 300 Kan. 1, 250, 331 P.3d 544 (2014), *rev'd and remanded on other grounds by* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016). But "'expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony, not commentary on the evidence of the case.'" *State v. Brown*, 300 Kan. 542, 560, 331 P.3d 781 (2014).

> "A prosecutor may not encourage the jury to decide a case based on a personal interest instead of neutrality or distract the jury from its duty to make decisions based on the evidence and the controlling law. See *State v. Corbett*, 281 Kan. 294, 313, 130 P.3d 1179 (2006). But a prosecutor may use "'picturesque speech" as long as he or she does not refer to facts not disclosed by the evidence.' *State v. Crawford*, 300 Kan. 740, 748-49, 334 P.3d 311 (2014)." *State v. Fisher*, 304 Kan. 242, 254, 373 P.3d 781 (2016).

In another part of the closing, the prosecutor said:

> "Now, as to the statement to Bailey and to Sergeant Volle, the nice thing is if you're always telling the truth, you don't have to remember the details about what you said. But this gal talked to Sergeant Volle on July 11, 2002, she didn't give the details of where she had been to Bailey until August 12th, 2002, *and you know what, [f]olks, she's not as smart as she thought. She forgot what she told Volle*." (Emphasis added.)

41

The State argues this was proper because it addressed inconsistencies in Chandler's statements. And the first part appears to fall within the bounds of evidence-based argument about the credibility of Chandler's alibi statements. See *State v. Duong*, 292 Kan. 824, 831-32, 257 P.3d 309 (2011) (permissible for prosecutor to argue defendant's statements not credible based on references to evidence rebutting the statements). But the second part—in which the prosecutor argued Chandler was "not as smart as she thought" because "[s]he forgot" her prior version of the alibi—was just a euphemistic way of saying she lied. See *Duong*, 292 Kan. at 830 ("[A]ccusing a defendant of lying is outside the wide rhetorical latitude afforded prosecutors in closing argument."). And the manner in which the prosecutor expressed this further relied on the prosecutor's personal opinion that Chandler lied because she thought she could outsmart the police and the jury.

A prosecutor is forbidden from offering personal opinion that a defendant's testimony is untruthful. See, e.g., *Brown*, 300 Kan. at 560 (holding prosecutorial remark that defendant "had the weekend to 'decide'" how to testify in response to evidence against her was error); *State v. Akins*, 298 Kan. 592, 607-08, 315 P.3d 868 (2014) (error when prosecutor asked did the jury "'buy'" defendant's story and said his testimony was "'not credible'"); *State v. Elnicki*, 279 Kan. 47, 63, 105 P.3d 1222 (2005) (error for prosecutor to call defendant's statement "a 'fabrication,' 'yarn,' 'final yarn,' and 'the yarn spun here, the four-part yarn.'").

We hold these comments were error. They not only were unsupported by the evidence, but they conveyed the prosecutor's unfounded, gratuitous belief that Chandler thought the jury was not smart enough to figure out the crime. In effect, the prosecutor urged jurors to convict Chandler to keep her from getting the better of them.

42

*Leaving children without their dad and his fiancée*

In the rebuttal portion of closing arguments, the prosecutor said,

"Now the State, just like the defense, would also like to implore you not to convict an innocent person. That would be horrible. Don't convict an innocent person. Instead, *convict her because* she killed Mike Sisco, she killed Karen Harkness, *and she robbed her own children of their father and his fianc[ée]*. You're at the end of the story. Come back to us and tell us the words we all want to hear and we want to hear it twice. Tell us guilty, she did it. Don't tell us we know. Tell us." (Emphases added.)

The italicized comment is concerning because it elicits sympathy for the children. In *State v. Holt*, 300 Kan. 985, 992, 336 P.3d 312 (2014), the court held it was improper for the prosecutor to comment during a murder trial that "'now there is a 9-year-old boy and a newborn boy both with no dad.'" The court noted the fact the victim was a father was relevant to the State's theory the murder was motivated by jealousy. 300 Kan. at 993. "But the prosecutor took a step beyond reciting this evidence and noting its significance; the prosecutor emphasized that the children were left without a father, a fact not relevant to proving the charged crimes and significant only as an appeal to sympathy." 300 Kan. at 993; see also *State v. Adams*, 292 Kan. 60, 67-68, 253 P.3d 5 (2011) (improper for prosecutor to argue trial was only chance to have someone held accountable for taking victim's life, so day of deliberations was "'as much about him if not more than anyone else'"); *State v. Henry*, 273 Kan. 608, 640-41, 44 P.3d 466 (2002) (improper for prosecutor to urge jury to think about how murder victim's mother must have felt on Mother's Day).

The prosecutor expressly urged the jury to convict Chandler "because . . . she robbed her own children of their father and his fianc[ée]." We hold this comment was error.

43

*Disobeying court order not to refer to people in the gallery*

This court raised this issue sua sponte during the first oral argument. To put our concern in context, the district court noted before closing arguments there were observers in the courtroom's public seating area. The judge then directed, "I do not want any of the folks that are in the gallery to be asked to stand up at any time during the closings." The prosecutor stated, "I got you." This was an apparent reference to a prior trial the judge presided over with the same prosecutor. The court continued:

"The Court: Ms. Spradling knows what I'm talking about.
"[Prosecutor]: Yes, I do, your honor.
"The Court: I will [be] jumping on you big time, if you do that. Do not do that in this case. *I don't want references to folks here at all*." (Emphasis added.)

But despite this admonition, the prosecutor violated the court's order after playing a recorded jailhouse phone call between Chandler and Riegel by stating, "That's the defendant and her close friend Shirley Riegel *that I'm getting a look from* talking about what a great day it was because Patti Williams was dead and can't put the defendant in Kansas." (Emphasis added.)

The trial court later ruled the prosecutor disregarded its order, but declined to declare a mistrial, stating:

"With regard to the comment that Ms. Spradling made about Shirley Riegel, that's what I meant to direct everybody yesterday to do. Let's don't bring the folks that are in the gallery, the audience into this in one way or the other negatively, positively, sympathetically or in any way. I'm going to deny the motion for mistrial because I don't believe it rises to that level. Let us not do that, we don't need that. Folks are sensitive. This is so important . . . to all of these people in the room. I don't believe we need to cast

44

[a]spersions upon anyone or bring attention to that. So I would agree with Mr. Bennett's comment, but I don't believe it rises to the level of mistrial."

This court asked about the gallery comment during the first oral argument. The State's counsel, who was also the prosecutor, declared she did not violate the order. She explained she did not ask half the gallery to stand up, noting that talking about the defendant's sister was not the same thing. But this response reflected a disquieting lack of candor with this court because it is obvious the trial court's instruction included not referring to people in the gallery. And counsel also knew the trial court had concluded her comment violated that instruction, yet she claimed no violation occurred. It goes without saying prosecutors, as officers of the court, are obligated to follow a court's directive. *In re Kline*, 298 Kan. 96, 137, 311 P.3d 321 (2013).

*Comment on post-arrest silence*

Chandler argues the prosecutor improperly commented on her post-arrest silence during closing argument:

"How else do we know the defendant is guilty? She was arrested eight days after the murders on something else, not the murders, something else. *And does she say to the police officers, Officer Roberts, Officer Noonan, Officer Walter[] or Detective Mike Barron, does she ask any of those four why am I under arrest? Nope. You know she never asked why she was under arrest, because she already knew. She knew, because she knew what she had done eight days earlier*." (Emphasis added.)

Chandler contends this commentary was contrary to the evidence and violated her Sixth Amendment right to counsel and Fifth Amendment right to remain silent, citing *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). Some additional background is necessary.

45

The prosecutor was referring to a July 15, 2002, traffic stop when police arrested Chandler on a child support warrant. During Detective Barron's examination, the State requested a sidebar to proffer his testimony that when arrested, Chandler did not ask why. The court ruled this was irrelevant, i.e., inadmissible. Even so, the State circled back to this topic with different witnesses. The State called Officer Tammy Walter for the sole purpose of asking about Chandler's silence. Walter transported her back to the police station after the arrest. Walter testified Chandler did not ask why she was being placed in the police car. Defense counsel failed to object to this testimony, but cross-examined Walter about whether Walter was present during the entire arrest. Walter made clear she was not.

Later, when presenting evidence in her defense, Chandler called Officer Kelly Roberts, who conducted the traffic stop. On cross-examination, the State asked Roberts whether any officer present at the stop told Chandler why she was under arrest. He said no. The State then asked, "And she never asked why she was being arrested, right?" The officer answered, "No."

Neither testimony fully supports what the prosecutor said in closing: "And does she say to the police officers, Officer Roberts, Officer Noonan, Officer Walter[] or Detective Mike Barron, does she ask any of those four why am I under arrest? Nope."

Had the evidence been limited to what Walter said, it would not support the prosecutor's claim because Walter said she was not present during the entire arrest. Roberts' testimony presents a much closer call. The issue is whether the prosecutor reasonably could infer Chandler did not ask *any* of the four officers named why she was under arrest. It is possible to read Roberts' testimony to mean he was referring only to himself. There was no foundation laid by the State to explain why Roberts might know what Chandler may have asked the other officers (Noonan and Barron). Worse yet, the

46

district court already ruled during Barron's testimony it was irrelevant whether Chandler asked why she was under arrest, so why would the State even try to infer this "fact" based on that ruling and this limited testimony? In the end, we decline Chandler's request to categorize the prosecutor's statement as being wholly outside the evidence, but her point is well taken.

The far more serious constitutional question is the State's argument that the jury could infer Chandler committed two premediated first-degree murders if she did not ask why she was under arrest. Chandler asserts this was a *Doyle* violation, but that is not necessarily the problem. In *Doyle*, the United States Supreme Court explicitly held "that *the use for impeachment purposes of [the defendants'] silence*, *at the time of arrest* and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." (Emphasis added.) *Doyle*, 426 U.S. at 619. The Court noted *Miranda* warnings are "a prophylactic means of safeguarding Fifth Amendment rights" and must be immediately administered to a person taken into custody. 426 U.S. at 617. In other words, *Doyle* and its progeny highlight a due process limitation on the State using post-*Miranda* silence for impeachment purposes. *State v. Wilkerson*, 278 Kan. 147, 157, 91 P.3d 1181 (2004).

But Chandler did not testify, so the State was trying to use her silence at the traffic stop as evidence of her guilt—not for impeachment. The State went so far as to identify this silence as a reason the jury would "know the defendant is guilty." And in this context, this court has more broadly held that it is improper for a prosecutor to argue a defendant's guilt can be inferred from silence at a custodial interview because the defendant is not obligated to respond to questioning. *State v. Stafford*, 296 Kan. 25, 58, 290 P.3d 562 (2012).

47

The State contends the prosecutor's comment was proper because the State claims Chandler's silence was before her *Miranda* warnings. The State's problem is that the record is silent about when *Miranda* warnings may have been given during this arrest. And based on the lack of a record, the State asks us to assume the officers did not immediately administer Chandler's *Miranda* warnings and then conclude based on this assumption that the State based its closing argument only on pre-*Miranda* silence. This asks too much given the constitutional rights at stake.

There is a split of authority in the federal courts as to whether using a defendant's post-arrest, pre-*Miranda* silence as evidence of guilt violates the right against self-incrimination when the silence is not preceded by police questioning. See *United States v. Salinas*, 480 F.3d 750, 758-59 (5th Cir. 2007) (declining to resolve whether Fifth Amendment violated when defendant's post-arrest, pre-*Miranda* silence is used as substantive evidence of guilt; noting Seventh, Ninth, and D.C. Circuits hold this practice is prohibited, First and Sixth Circuits hold even some pre-arrest silence is protected, but Fourth, Eighth, and Eleventh Circuits disagree); *United States v. Whitehead*, 200 F.3d 634, 638-39 (9th Cir. 2000) (holding prosecutor's comment on post-arrest, pre-*Miranda* silence violated right against self-incrimination because this would constitute "'an impermissible penalty on the exercise of the . . . right to remain silent'"); *United States v. Moore*, 104 F.3d 377, 385, 389 (D.C. Cir. 1997) ("[N]either *Miranda* nor any other case suggests that a defendant's protected right to remain silent attaches only upon the commencement of questioning as opposed to custody" and "the law is plain that the prosecution cannot, consistent with the Constitution, use a defendant's silence against him as evidence of his guilt.").

We have not addressed this exact question, and we need not weigh in on it today based on the existing trial record. We observe only that for the State's argument to have even potential viability, it would first need to establish when the *Miranda* warnings were

48

given, and then convince a court the legal position taken by the Fourth, Eighth, and Eleventh Circuits is superior to the opposing view staked out by the Seventh, Ninth, and D.C. Circuits. Given the lack of foundation presented by this record, the remark about Chandler's silence was at best cavalier as to the defendant's constitutional right to a fair trial.

## PROSECUTORIAL MISCONDUCT

In *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016), the court emphasized that despite its decision to move from the term "prosecutorial misconduct" to "prosecutorial error" when considering these appeals, the court was not abandoning prosecutorial misconduct as a descriptor for more serious occurrences, explaining:

> "[W]e are all too aware that the behaviors properly described as prosecutorial misconduct do still occur in Kansas. The power of the State to charge and prosecute its citizens for criminal violations of the law is a fearsome one, and it is vested exclusively in a prosecutor who is given vast discretion to make both charging decisions and the myriad of practical and strategic decisions that occur in the course of a prosecution. 'The prosecutor has more control over life, liberty, and reputation than any other person in America.' Robert H. Jackson, U.S. Attorney Gen., The Federal Prosecutor, Address Before the Second Annual Conference of United States Attorneys (April 1, 1940). To suffer an abuse of this power at the hands of an unethical prosecutor is one of the grossest inequities and indignities that can be visited upon a citizen by the State. Such abuse cannot be tolerated in a free society." 305 Kan. at 92.

In *Sherman*, we said, "Prosecutorial acts properly categorized as 'prosecutorial misconduct' are erroneous acts done with a level of culpability that exceeds mere negligence." 305 Kan. at 114. We have those in Chandler's case. The prosecution's lapses compel the harsher prosecutorial misconduct label. The errors outlined in this decision

49

are not "minor aberrations in a prolonged trial." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 240, 60 S. Ct. 811, 84 L. Ed. 1129 (1940).

Taken as a whole, this prosecution unfortunately illustrates how a desire to win can eclipse the State's responsibility to safeguard the fundamental constitutional right to a fair trial owed to any defendant facing criminal prosecution in a Kansas courtroom.

Our rulings make it unnecessary to consider Chandler's remaining issues on appeal.

Reversed and remanded.