NOT DESIGNATED FOR PUBLICATION

No. 118,896

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DERRICK R. BISHOP,
*Appellant*.

MEMORANDUM OPINION

Appeal from Riley District Court; MERYL D. WILSON, judge. Opinion filed June 7, 2019. Affirmed in part and reversed in part.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Bethany C. Fields*, deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., PIERRON and MALONE, JJ.

PER CURIAM: Under K.S.A. 2015 Supp. 21-5503(a)(1)(A), rape is "[k]nowingly engaging in sexual intercourse with a victim who does not consent to the sexual intercourse . . . [w]hen the victim is overcome by force or fear." "'Sexual intercourse' means any penetration of the female sex organ by a finger, the male sex organ or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse." K.S.A. 2015 Supp. 21-5501(a).

A jury convicted Derrick R. Bishop of two counts of rape, one count of sexual battery, and one count of indecent liberties with a child. Bishop appealed, challenging the sufficiency of the evidence for three of his convictions and alleging prosecutorial error.

First, Bishop argues that there was insufficient evidence of penetration in one of the counts of rape, because the victim, H.C., only testified that she "fingered" herself at Bishop's request. Bishop's argument is persuasive. The term "fingered," without any explanation of what that term means to the victim, is insufficient to prove that penetration occurred because the jury would have to make an inference on facts not in evidence to conclude that it meant penetration.

Second, Bishop challenges whether there was sufficient evidence that H.C. was overcome by force or fear. However, H.C. testified that she was afraid that Bishop would end his relationship with her mother and leave the family unable to care for itself if she did not agree to Bishop's requests. This was sufficient evidence to submit the matter to the jury.

Third, Bishop argues that there was insufficient evidence to convict him of indecent liberties with a child because the crime did not occur during the time frame specified in the complaint. While Bishop is correct that the State alleged the wrong time frame, the State did not have to prove the time frame beyond a reasonable doubt because time is not an indispensable element of indecent liberties with a child.

Finally, Bishop argues that several comments made by the prosecutor during closing argument constituted reversible prosecutorial error. After a thorough review, we find that only one of the statements made by the prosecutor was in error, but the error was harmless.

Bishop's conviction for Count 6, rape, is reversed for insufficient evidence. The balance of his convictions are affirmed.

FACTUAL AND PROCEDURAL HISTORY

H.C. was born in September 1999. On January 23, 2016, H.C., then 16 years old, attended a funeral with her aunt and uncle in Newton, Kansas. After the service, H.C. disclosed to her uncle that Bishop, her mother's boyfriend, had been engaging in acts of a sexual nature with her. He had been kissing her, slapping her butt, hugging her, entering the bathroom while she showered, watching her dry off, asking if she wanted to watch him masturbate, and showing her pornography. H.C. reported that when she told Bishop no, he would act coldly toward her and ignore her for several days. H.C. did not like feeling exiled and ignored, and so she felt like Bishop was punishing her when she refused him. Two days later H.C.'s uncle contacted the Riley County Police Department to report H.C.'s allegations. He also contacted the Kansas Department for Children and Families. H.C. went into police protective custody and ultimately went to live with her aunt and uncle while police investigated the case.

After receiving the report of alleged sexual abuse, H.C.'s school resource officer transported H.C. to the Riley County Police Department to be interviewed by Detective Jessica Ehrlich. Detective Ehrlich also interviewed Bishop. Both interviews were recorded and played for the jury.

H.C. and her mother generally lived with her mother's boyfriends. When H.C. was in second grade, H.C. and her mother moved to Manhattan with Bishop. Between 5th grade and her first year of high school, H.C. lived with her aunt and uncle. H.C. then moved back in with her mother and Bishop. H.C. did not have a good relationship with her mom. She did have a close relationship with Bishop, whom she described as her dad.

3

At trial, H.C. testified that Bishop started kissing her and telling her that he loved her when she was a freshman in high school. It started with closed-mouth kissing but progressed to open-lipped kissing and make out sessions. When asked what her reaction to this was, H.C. testified that she "never really did anything about it." H.C. alleged that Bishop would engage in this behavior when her mom was out of the home. Then, H.C. alleged that Bishop began touching her breasts. He started on the outside of her clothing, but later moved underneath her clothing. H.C. also alleged that Bishop would touch her butt, and that he slapped it on a couple of occasions. She believed this was done in a playful manner and not a sexual one.

H.C. also alleged that Bishop showed her pictures of naked women on his computer. Additionally, H.C. said that Bishop asked her to send him naked pictures of herself. She testified that she sent Bishop some pictures.

On one occasion, H.C. asked Bishop to wake her up in the morning as she would often ignore her alarm. She alleged that Bishop woke her up by kissing her, starting on her stomach and moving down to her vagina.

On another occasion, H.C. reported that Bishop entered the bathroom while she was taking a shower. She testified: "One time he had asked me to finger myself in front of him, so I lifted my towel and let him watch." She said that the incident lasted less than five seconds because her mom called her name. She explained that she did not want to do what Bishop asked but she "always had a fear that if I didn't do what he would ask, then we would have nowhere to live." She added that Bishop was the "main supplier of our lives." He paid for their housing and bills. Her mother bought their food. H.C. said there were other occasions where Bishop would enter the bathroom after she showered and he would ask to see her breasts. H.C. did not agree to Bishop's requests on every occasion, testifying that she "would only show him sometimes."

4

Another incident that H.C. described occurred one week before her disclosure to her uncle in January 2016. H.C. testified that Bishop produced a vibrator and asked her if she knew what it was. She told him no. He said he wanted to show her how to use it. So, he took her into his bedroom, laid her on the bed, removed her pants, turned the vibrator on, and placed it inside of her. In her interview with Detective Ehrlich, H.C. described his actions as pushing her on the bed. H.C. backed away from him after he put the vibrator inside her and he removed it. She testified that she did not feel like Bishop forced her to go into the bedroom, although he did hold her hand as they went to the bedroom. She explained that she did not refuse him "[b]ecause any time I ever said no he would always just keep continually saying please do it."

When Detective Ehrlich asked H.C. why she acquiesced to Bishop's requests, H.C. told her that she was protecting her family. She believed that Bishop would leave her mom if she did not do what he asked and that her mom would be unable to survive financially.

Bishop mostly denied engaging in sexual behavior with H.C. He did say that he kissed H.C., but only closed-mouth kisses. He described it as kisses that a father and daughter might do. Bishop also admitted to showing H.C. a vibrator. He said that after he showed the vibrator to H.C., she used it. When Detective Ehrlich asked Bishop if he helped her use it, he denied doing so. However, a couple minutes later Bishop told Detective Ehrlich that he did help H.C. use the vibrator. He said that H.C. took her clothes off and was laying on the bed and he put the vibrator inside of her. When she said she did not like it, he put it away.

The State filed a complaint charging Bishop with one count of rape for inserting a vibrator into H.C.'s vagina, one count of indecent liberties with a child for touching H.C.'s breasts and buttocks on top of her clothing, one count of indecent liberties with a child for touching H.C.'s breasts and buttocks beneath her clothing, and one count of

5

aggravated sexual battery for kissing H.C.'s vagina while she was sleeping. The State later filed an information charging nine additional counts. Count 5 was for aggravated sexual battery alleging that Bishop put his mouth on H.C.'s nipples. The State later dismissed this count. Count 6 alleged that Bishop raped H.C. by causing her to masturbate for him. The remaining seven counts were for sexual exploitation of a child.

The jury found Bishop guilty of both counts of rape. It acquitted him of the first count of indecent liberties with a child but convicted him of the second count. The jury also found Bishop guilty of sexual battery but not aggravated sexual battery. The jury found Bishop not guilty of all seven counts of sexual exploitation of a child. Bishop filed a motion for judgment of acquittal, and the district court denied it.

The district court sentenced Bishop to 147 months' imprisonment and lifetime postrelease supervision for Count 1 (rape). The district court ordered him to serve concurrent sentences of 147 months' imprisonment for Count 6 (rape), 31 months' imprisonment for Count 3 (indecent liberties with a child), and 12 months' imprisonment for Count 4 (sexual battery).

Bishop appealed.

ANALYSIS

*The evidence was insufficient to prove the penetration element of rape in Count 6.*

In Count 6 of the complaint, the State charged Bishop with rape by causing H.C. to masturbate in front of him. H.C. testified that Bishop asked her to "finger" herself in front of him after taking a shower, so she lifted her towel and let him watch. Bishop argues that this testimony is insufficient to prove the penetration element of rape.

6

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

The State charged Bishop with rape pursuant to K.S.A. 2015 Supp. 21-5503(a)(1)(A) ("Knowingly engaging in sexual intercourse with a victim who does not consent to the sexual intercourse . . . [w]hen the victim is overcome by force or fear."). "'Sexual intercourse' means any penetration of the female sex organ by a finger, the male sex organ or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse." K.S.A. 2015 Supp. 21-5501(a).

The issue is whether H.C.'s testimony that she "fingered" herself is sufficient to prove the penetration element of rape. Bishop argues that the evidence is insufficient because H.C. did not describe what "fingering" herself entailed, and the State did not define the term. The State replies that the jurors were able to use their common knowledge and experience in determining what the term meant. The State asserts, without support, that "fingering" means vaginal penetration. It suggests that the jurors could have also concluded that "fingering" meant penetration of the labia majora, labia minora, or the vaginal lips. In his reply brief, Bishop notes that even the State cannot present a common meaning of the term. He adds that, more importantly, the State did not ask what H.C. meant by the term.

Kansas courts have not addressed whether the term "fingering" is sufficient to prove penetration. However, the issue has arisen in several other states. Although cases from other state courts are not binding on this court, their analyses are instructive. See *State v. Quested*, 302 Kan. 262, 273, 352 P.3d 553 (2015) (cases from other states are not binding on court).

In *Davis v. Commonwealth*, No. 0908-05-2, 2006 WL 1815065 (Va. Ct. App. 2006) (unpublished opinion), appellant William Joseph Davis made an argument very similar to Bishop's argument. There, Davis told a detective that he "fingered" 15-year-old L.W. 2006 WL 1815065, at *1. The State charged Davis with animate object sexual penetration, which requires penetration of the labia majora or anus of a complaining witness. At trial, the detective testified that Davis' statement that he "fingered" L.W. meant that he "'actually placed' or 'inserted his fingers' 'inside of [L.W.'s] vagina.'" 2006 WL 1815065, at *1. The detective clarified that Davis never specifically stated that he penetrated L.W. or inserted his fingers into her vagina. At trial, Davis admitted to telling the detective that he fingered L.W., but explained that he did not know that the detective would interpret the term to mean that he put his hand inside of L.W. Davis testified that he only "put his hand 'on top of her vagina[,] . . . that's her pubic hair, basically,' and denied, upon detailed cross-examination, feeling the lips of her vagina or her clitoris." 2006 WL 1815065, at *1.

As in Kansas cases reviewing the sufficiency of the evidence, Virginia courts "view the evidence in the light most favorable to the Commonwealth, granting to that evidence all reasonable inferences deducible therefrom." 2006 WL 1815065, at *2; see *Chandler*, 307 Kan. at 668. The court noted that "in order to sustain a conviction for object sexual penetration, whether penetration occurred may not be left to conjecture." *Davis*, 2006 WL 1815065, at *3. The court stated that the only evidence of penetration in the case was Davis' admission to the detective that he fingered the victim. 2006 WL 1815065, at *3. Davis explained that he did not intend the term to mean penetration. The Court of Appeals stated that the district court was free to find Davis' explanation was not credible, but "nevertheless, the remaining evidence was insufficient to prove beyond a reasonable doubt that digital penetration occurred." 2006 WL 1815065, at *4. The court also found that the detective's definition of the term "finger" was insufficient to prove penetration because he "did not testify why he believed the term had such a meaning or that this definition was commonly accepted 'street' slang for 'digital penetration' among

8

members of appellant's generation." 2006 WL 1815065, at *4. The court concluded that "[i]n the absence of additional evidence about what fingering means in this context, '[w]e are left to speculate about what actually occurred' between [Davis] and L.W." 2006 WL 1815065, at *4 (quoting *Welch v. Commonwealth*, 271 Va. 558, 564, 628 S.E.2d 340 [2006]).

In Utah, a jury convicted Cory Patterson of one count of object rape. One element of object rape is causing "penetration, however slight, of the genital or anal opening of another person . . . ." Utah Code Ann. § 76-5-402.2(1) (2016 Supp.). "Penetration" means "'entry between the outer folds of the labia.'" *State v. Patterson*, 407 P.3d 1002, 1004 (Utah Ct. App. 2017) (quoting *State v. Simmons*, 759 P.2d 1152, 1154 [Utah 1988]). The victim testified that Patterson "'put his hand down my pants and started touching my vagina and moving his hand around that area.'" 407 P.3d at 1004. Further, she testified that "'when he started trying to put his fingers up my vagina I told him to stop, and he kept saying, "No, no, it's okay. It's okay."'" 407 P.3d at 1004. When she asked him to stop again, Patterson "'kind of moved his fingers back and just started touching around the area instead of putting his fingers up, instead of penetrating.'" 407 P.3d at 1004. The prosecutor asked the victim to provide more detail, asking her to describe where on the victim's vagina Patterson touched. She replied: "'He touched the general area. Then when he was trying to put his fingers up he separated the labia' using '[j]ust one hand, his two fingers.'" 407 P.3d at 1004. The victim added that "'It really hurt. I had never felt anything like that before.'" 407 P.3d at 1004. Patterson appealed his conviction.

On appeal, Patterson argued that the State presented insufficient evidence of penetration. When an appellant challenges the sufficiency of the evidence, the Utah appellate courts "review the evidence and all inferences that may reasonably be drawn from it in the light most favorable to the jury's verdict." 407 P.3d at 1003. This is similar to this court's standard of review for sufficiency issues. See *Chandler*, 307 Kan. at 668.

9

The court held that the victim's testimony did not explicitly describe penetration. *Patterson*, 407 P.3d at 1005.

While the victim did not explicitly describe penetration, the court held that the jury could have reasonably inferred that Patterson penetrated the victim. 407 P.3d at 1006-07. To begin its analysis, the court described the difference between a permissible inference and impermissible speculation. The court explained:

> "[A] jury's inference is reasonable 'if there is an evidentiary foundation to draw and support the conclusion' but is impermissible speculation when 'there is no underlying evidence to support the conclusion.' [Citation omitted.] Put another way, 'an inference may not properly be relied upon in support of an essential allegation if an opposite inference may be drawn with equal consistency from the circumstances in proof.' [Citation omitted.]" 407 P.3d at 1006.

The court explained its task as "consider[ing] whether the two scenarios Victim's testimony might have described—penetration or non-penetration—'may be drawn with equal consistency' from that testimony." 407 P.3d at 1006 (quoting *United States v. Finnerty*, 470 F.2d 78, 81 [3d Cir. 1972]). The court reviewed the evidence as follows:

> "Victim testified that Defendant attempted to penetrate her using two fingers to 'separate[]' her labia. This might describe separation by insertion (penetration) or separation by stretching the skin adjacent to the labia (not penetration). Victim also testified that, after she repeatedly asked him to stop, Defendant 'kind of moved his fingers back and just started touching around the area.' Again, this might describe Defendant removing his fingers from Victim after penetrating her or Defendant pulling his hand away from her vagina and labia without having penetrated Victim. And Victim testified that, '[i]t really hurt. I had never felt anything like that before.' Arguably, this testimony might describe physical pain from penetration or emotional trauma from Defendant's forcible sexual abuse of Victim. Thus, each of these pieces of testimony may plausibly be

10

interpreted as describing either a penetrative scenario or a non-penetrative scenario." 407 P.3d at 1006.

While the court concluded that the victim's "testimony was susceptible to two interpretations, it was not *equally consistent* with both." 407 P.3d at 1006. The court thought that the victim's description of the pain accompanying Patterson's actions suggested that separation of her labia was accomplished through digital penetration. 407 P.3d at 1006. Additionally, Patterson testified that his goal was penetration, and not merely separation of the labia. The court concluded that the jury had a sufficient evidentiary basis for the adoption of one inference over the other. 407 P.3d at 1007.

After reviewing the testimony, we conclude that H.C.'s testimony that she was "fingered" is insufficient on its own to prove beyond a reasonable doubt that penetration occurred. As in both *Davis* and *Patterson*, the State did not present any evidence defining the term. H.C. did not explain what the term meant to her. A "'victim . . . must describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g. lewd conduct, intercourse, oral copulation or sodomy).'" *State v. Spear*, 297 Kan. 780, 794, 304 P.3d 1246 (2013) (quoting *People v. Jones*, 51 Cal. 3d 294, 316, 270 Cal. Rptr. 611, 792 P.2d 643 [1990]). Here, the use of the term "fingered" is not sufficiently specific for the jury to conclude that penetration occurred. Therefore, H.C.'s testimony, standing alone, is insufficient to prove that element of rape.

The State urges this court to find that the jury could have reasonably inferred based on the jurors' common knowledge and experience that the term described an act of penetration. But as our court has explained:

"[W]hile it is true that a conviction may be sustained by circumstantial evidence, see *State v. Garcia*, 285 Kan. 1, 22, 169 P.3d 1069 (2007), guilt may never be based on

11

inference alone. Reasonable presumptions and inferences may be drawn from facts established by direct or circumstantial evidence, but a presumption may not be based upon a presumption or an inference upon an inference. *State v. Doyle*, 201 Kan. 469, Syl. ¶ 8, 441 P.2d 846 (1968)." *State v. Perez-Rivera*, 41 Kan. App. 2d 579, 582, 203 P.3d 735 (2009).

Here, there were simply no additional facts from which the jury could draw a reasonable inference that the term "fingered" included an act of penetration. The facts of this case are distinguishable from the facts of *Patterson*, where the Utah Court of Appeals upheld a conviction based on a reasonable inference of penetration based on the victim's testimony that she experienced pain and the defendant's testimony that his goal was penetration.

Moreover, this court has previously refused to allow juries to use their personal knowledge to infer facts not presented at trial. For example, in *State v. Star*, 27 Kan. App. 2d 930, 10 P.3d 37 (2000), this court had to determine whether there was sufficient evidence to sustain Andrew Star's conviction for sale of cocaine within 1,000 feet of a school. One element of the crime was that the sale of cocaine had to occur "within 1,000 feet of any school property upon which is located a structure used by a unified school district or an accredited nonpublic school for student instruction or attendance or extracurricular activities of pupils enrolled in kindergarten or any of the grades one through 12." K.S.A. 1999 Supp. 65-4161(d); 27 Kan. App. 2d at 933. The State presented evidence that Star sold cocaine within 1,000 feet of Hickok School in Grant County. On appeal, Star argued that the State failed to present evidence "that Hickok School was a structure used in the manner required by the statute." 27 Kan. App. 2d at 933. The State replied that, because the jurors were all from Grant County, they could infer that Hickok School satisfied the statutory definition. This court reversed Star's conviction, holding that the State failed to provide evidence that the school fit within the statutory definition. 27 Kan. App. 2d at 936. The court added that "[s]uch evidence is necessary to prove a necessary element of the offense, and where lacking, a jury cannot be allowed to speculate or infer through its own observations that the structure complies with the

12

statutory definition of a school." 27 Kan. App. 2d at 936; see also *Perez-Rivera*, 41 Kan. App. 2d 579 (rejecting the State's argument that a jury could infer through its own observations that the victim was 18 years old or older, a necessary element of the crime on appeal, because "a juror's inference can only be based on evidence presented at trial").

The State has a burden to prove each element of a crime beyond a reasonable doubt. K.S.A. 2015 Supp. 21-5108. The State failed to do that in this case. By not asking H.C. what she meant by "fingering," the jury could not determine whether there was penetration of the female sex organ as required to sustain a conviction for rape. Accordingly, we reverse Bishop's conviction of Count 6, rape.

*There was sufficient evidence to prove the force or fear element of rape in Counts 1 and 6.*

Next, Bishop argues that the State failed to present sufficient evidence that H.C. was overcome by force or fear in both of the rape counts.

Because Bishop is challenging the sufficiency of the evidence, we apply the same standard of review: whether we are convinced, when reviewing the evidence in the light most favorable to the State, that a rational fact-finder could have found Bishop guilty beyond a reasonable doubt. See *Chandler*, 307 Kan. 668.

As discussed above, the State charged Bishop with rape pursuant to K.S.A. 2015 Supp. 21-5503(a)(1)(A) ("Knowingly engaging in sexual intercourse with a victim who does not consent to the sexual intercourse . . . [w]hen the victim is overcome by force or fear."). For Count 6, the bathroom incident, the district court held that there was no evidence of force so it only instructed the jury on fear. For Count 1, the vibrator incident, the district court instructed the jury that it could find force or fear.

13

"Force or fear within the definition of rape is a highly subjective concept that does not lend itself to definition as a matter of law." *State v. Tully*, 293 Kan. 176, Syl. ¶ 12, 262 P.3d 314 (2011). Fear is "inherently subjective" because "[w]hat renders one person immobilized by fear may not frighten another at all." *State v. Borthwick*, 255 Kan. 899, 913, 880 P.2d 1261 (1994). In analyzing the sufficiency of evidence regarding fear, the Kansas Supreme Court has held: "[W]hen a victim testifies that she was overcome by fear, and her testimony is not 'so incredible as to defy belief,' [citation omitted], there is sufficient evidence to present the ultimate determination to the factfinder." 255 Kan. at 913-14.

In regard to force, the Kansas Supreme Court has stated:

"The 'force' required to sustain a rape conviction in this state does not require that a rape victim resist to the point of becoming the victim of other crimes such as battery or aggravated assault. K.S.A. 21-3502 [now K.S.A. 2018 Supp. 21-5503] does not require the State to prove that a rape victim told the offender she did not consent, physically resisted the offender, and then endured sexual intercourse against her will. It does not require that a victim be physically overcome by force in the form of a beating or physical restraint. It requires only a finding that she did not give her consent and that the victim was overcome by force or fear to facilitate the sexual intercourse." 255 Kan. at 914.

*There was sufficient evidence to find that H.C. was overcome by fear in Counts 1 and 6.*

The evidence established that H.C. feared that Bishop would leave the family if she did not agree to his requests and that this would leave the family unable to care for itself financially. The State asserts that this is sufficient to sustain Bishop's convictions for Counts 1 and 6. Bishop first argues that the State presented insufficient evidence of fear. He also asserts that the State's evidence merely shows that H.C. acquiesced and that none of the evidence shows that H.C. was "overcome" by fear as required by the statute.

14

First, Bishop argues that there was insufficient evidence of H.C.'s fear. H.C. testified that she was afraid that Bishop would leave her family without a home if she did not do what he asked. As Bishop notes, however, there was no evidence that Bishop ever threatened H.C. This does not render the evidence insufficient. The victim does not need to be threatened to be overcome by fear. See *Borthwick*, 255 Kan. at 912 (finding sufficient evidence that victim was overcome by fear even though the defendant did not threaten the victim). Additionally, whether the victim's fear is reasonable is not a question for appellate courts but "may affect the jury's assessment of the victim's credibility in arriving at its verdict." 255 Kan. at 914. For these reasons, this court can find that H.C.'s testimony that she felt fear is sufficient.

Second, Bishop argues that the evidence was insufficient to show that H.C. was *overcome* by her fear. He notes that the mere existence of fear is not enough to sustain a conviction for rape. The fear must be of such a nature to overcome the victim's resistance. The "*actus reus*" of K.S.A. 2015 Supp. 21-5503(a)(1)(A) "is 'to overcome,' and the phrase force or fear merely describes this material element." *State v. Brooks*, 298 Kan. 672, 681, 317 P.3d 54 (2014). This court cannot question the reasonableness or existence of the fear as that is a question for the fact-finder. See *Borthwick*, 255 Kan. at 914. However, we must search for evidence that the victim was "overcome."

H.C. did testify that she was "always" afraid that he would leave the family. But, despite this fear being ever-present she refused Bishop on a number of occasions. For example, H.C. testified that Bishop asked her to masturbate in front of him "fairly often" in her final month of living with him, but she only did it one time. He also asked her to watch him masturbate, but she always refused him. This evidence shows that while H.C. felt afraid, the fear was not always of a nature to overcome her resistance.

H.C. also gave a number of other reasons for going along with Bishop's requests. When asked directly why she went into the bedroom with Bishop and the vibrator, H.C.

15

explained that any time she "ever said no he would always just keep continually saying please do it." When Detective Ehrlich asked H.C. if she ever said no to Bishop, H.C. said:

> "I mean I've tried. I'm like, 'I'm not comfortable with this,' but he just gets mad at me and then doesn't talk to me and then he'll make up some story to my mom about how I've got an attitude or something and then she's like, 'Well you need to just stop getting an attitude with him.' So then I just have to do it."

Similarly, Detective Ehrlich asked H.C. if Bishop would threaten her if she told him "no." H.C. said he did not threaten her, but he would get upset. When he is upset, he walks away from H.C. and will not talk to her, and then comes back to her and explains to her that she hurt him. H.C. explained that "he basically pouts like a three-year-old. It pisses me off. And then he'll walk away." She gave a similar reason to her uncle when he asked what would happen if she ever said "no" to Bishop, explaining that when she said "no" he would act coldly toward her and ignore her for several days. She said she did not like being "exiled like that and being ignored, so she felt like she was being punished."

H.C.'s frequent refusals of Bishop and her different reasons for agreeing to his requests does call into question whether she was "overcome by fear." Bishop notes that the Kansas Supreme Court has found that "overcome" means "'to get the better of'" and "'to affect or influence so strongly as to make physically helpless or emotionally distraught.'" *Brooks*, 298 Kan. at 691. It is synonymous with the terms overpower, conquer, and subdue. 298 Kan. at 691. He asserts that H.C.'s testimony does not rise to this level of being overpowered, conquered, or subdued. Instead, he submits that H.C. merely acquiesced to Bishop's requests, which is different than being overcome. "Acquiesce" means "to agree or consent quietly without protest, but without enthusiasm." Webster's New World College Dictionary 12 (5th ed. 2014). If H.C. consented, then Bishop's rape conviction could not stand.

16

The Kansas Supreme Court had an opportunity to examine the phrase "overcome by fear" in *Brooks*, 298 Kan. 672. Bishop relies on the dissenting opinions in *Brooks* in his argument. So we will examine that case.

In *Brooks*, George James Brooks, III, was convicted of raping J.P. under circumstances where she was overcome by force or fear. J.P. and Brooks were divorced. Approximately one year after they separated, Brooks obtained emails that J.P. sent to a married male coworker which showed that J.P. was having an affair with her coworker. Brooks called J.P. and told her he had copies of the emails. He read parts of them to her during the conversation. He concluded by telling J.P. that he would be going to her house that evening for sex. When he arrived at J.P.'s house, he said he would disclose the emails if J.P. did not have sex with him. J.P. told Brooks that she did not want to have sex with him, but she complied with his request. Brooks had intercourse with J.P. J.P. kept her hand over her face and her eyes closed so she would not have to look at Brooks. J.P. did not testify that she thought Brooks would have physically harmed her if she refused to have sex. Her only concern was that he would publicize her affair.

The Court of Appeals reversed Brooks' conviction. It held that a "victim must be fearful of the sort of force contemplated in the statute." *State v. Brooks*, 46 Kan. App. 2d 601, 612, 265 P.3d 1175 (2011). The Kansas Supreme Court reversed. *Brooks*, 298 Kan. at 673. It explained that the *Borthwick* court had "rejected the notion that the fear contemplated in the statute had to result from being threatened with a deadly weapon or even threatened with 'force that would prevent resistance by a reasonable person.'" 298 Kan. at 685 (quoting *Borthwick*, 255 Kan. at 913). The court noted that the Legislature did not limit the type of fear that could support a rape conviction. 298 Kan. at 687. The court added that "whether a victim is overcome by fear . . . is generally a question to be resolved by the finder of fact." 298 Kan. at 688. The court then determined that there was sufficient evidence that J.P. was overcome by fear. It stated:

17

"A rational factfinder could infer from the facts presented at trial that J.P. clearly feared Brooks would publicize the e-mails if she did not submit to having sex with him. And because of this fear, she ultimately submitted to having nonconsensual sex with Brooks. Furthermore, J.P.'s testimony indicates that Brooks' behavior and agitation inside her home contributed to J.P. being overcome by fear. J.P. stated that she initially refused Brooks' request for her to take off her underwear, but because Brooks became agitated, she ultimately complied. Finally, a rational factfinder could infer from J.P.'s actions while being sexually penetrated (*i.e.,* closing her eyes and covering her face with her hands) that she was overcome by fear. Finding otherwise is to deny the legitimacy of J.P.'s justifiable fear and its effect on her behavior." 298 Kan. at 690.

Both Justice Johnson and Justice Moritz dissented. 298 Kan. at 693-99. Justice Moritz explained that she did not believe the evidence was sufficient to show that J.P. was *overcome* by fear. She noted that "while the State presented evidence that the victim did not consent, I would find the evidence fell far short of establishing that the victim was overcome by force or fear." 298 Kan. at 694 (Moritz, J., dissenting). She criticized the way that the majority focused on the term "fear" but not the *actus reus* of the crime—to overcome. She thought that the act of submitting to a fear was distinguishable from being overcome by fear. 298 Kan. at 694-95 (Moritz, J., dissenting). J.P. had time to call law enforcement before Brooks arrived at her home but did not. Brooks was at J.P.'s house for several hours, but J.P. did not call law enforcement at that time either. She did not contact the police until several days after the rape because she was trying to "'get this situation under control' and secure a protection from abuse order." 298 Kan. at 696 (Moritz, J., dissenting). Justice Moritz believed that "while these may be the actions of someone who succumbed to conspiracy or blackmail, they are not the actions of someone *immobilized* or *paralyzed* by fear." 298 Kan. at 696 (Moritz, J., dissenting). Justice Moritz concluded:

"I would hold that the State does not prove the *actus reus* of the crime of rape simply by establishing that the victim did not consent and that the victim feared the defendant. Instead, the State must present sufficient evidence that the victim did not consent, that she

18

feared the defendant, and that she was immobilized or paralyzed by that fear." 298 Kan. at 698 (Moritz, J., dissenting).

Justice Johnson agreed with Justice Moritz that the evidence was insufficient to find that J.P. was overcome with fear. 298 Kan. at 693 (Johnson, J., dissenting). He believed that the evidence showed that J.P. did consent to having sex with Brooks. He explained:

"The majority is misdirected by J.P.'s apparent attempt to thwart Brooks' blackmailing scheme by telling him that she did not want to have sex and that the sex would be against her will. When that ploy failed, J.P. understood, as she recited at trial, that there was nothing else she could do, short of having sex with Brooks, to keep him from carrying out his threat to disclose her affair. Thus, she begrudgingly consented to have sex with Brooks in order to buy his silence. In other words, J.P. made the volitional choice to have sex with Brooks rather than having her extramarital affair disclosed to her boss and her paramour's spouse. That circumstance refutes the nonconsensual element of rape." 298 Kan. at 693-94 (Johnson, J., dissenting).

Justice Johnson was also concerned that "making the overcome-by-fear element a purely subjective determination . . . could raise due process concerns" because one person could not know what another's subjective fears are. 298 Kan. at 693 (Johnson, J., dissenting).

In addressing the dissenting opinions, the majority stated that the dissents took "on the role of a jury, weighing the evidence and passing on the credibility of J.P., something that is clearly improper on appellate review." 298 Kan. at 691-92.

Bishop uses the same reasoning as Justice Moritz—he asserts that even if there was fear, H.C. merely acquiesced and was not overcome. Bishop also makes the following argument:

19

"One might come away from *Brooks*, thinking that the question of whether the alleged rape victim was overcome by fear has no bounds. This is concerning. As Justice Johnson notes in his dissent, 'making the overcome-by-fear element a purely subjective determination . . . could raise due process concerns.' *Brooks*, 298 Kan. at 693, Johnson, J., dissenting. K.S.A. 2015 Supp. 21-5503(e) specifically provides that 'it shall not be a defense [to rape] that the offender did not know or have reason to know that the victim . . . was overcome by force or fear.' Add that to a boundless 'fear within the definition of rape is a highly subjective concept.' *Tully*, 293 Kan. Syl. ¶ 12. With all of this in mind, due process concerns become obvious. For example, how is a man, who asks a woman to engage in a sex act, on notice that what he is doing/about to do/wants to do might be or is a crime? If the meaning of 'fear' is limitless, then how is a person able to foresee that his/her conduct will be illegal? There has to be notice and/or a test of some kind in order to avoid due process violations.

"Furthermore, a perceived negative repercussion cannot be 'fear' for purposes of rape in K.S.A. 21-5503. Consider an unemployed male or female who feels like they have to have sex with a partner who supports him or her because they feel like refusing might result in an end to that relationship; regardless of the reasonableness of that belief, that cannot be rape. Consider a person on a date or at a party—he/she has sex with someone because he/she is afraid that the person will think he/she is not cool if he/she doesn't. That cannot be rape. Even consider an employer who tells a subordinate to have sex with them or the subordinate will be fired; consequently, that person is at risk of losing their job is he/she does not have sex with the employer. If the subordinate opts to have sex with the employer (rather than quit or report them), that is sexual harassment, cause for a civil suit, and certainly wrong, but not rape."

Bishop raises some concerning points. But the *Brooks* court chose *not* to address Justice Johnson's due process concerns. Under Kansas Supreme Court precedent, fear "is an inherently subjective concept" and "whether a victim is overcome by fear . . . is generally a question to be resolved by the finder of fact." *Brooks*, 298 Kan. 672, Syl. ¶ 2. Here, a juror could reasonably infer that the times H.C. did go along with Bishop's requests, it was because she was overcome by fear. The fear caused H.C. to do something that she did not want to do. See *Brooks*, 298 Kan. at 690-91 ("[T]he evidence presented at

20

trial established that Brooks' actions placed J.P. in fear. And because of this fear, J.P., against her will, submitted to being sexually assaulted by Brooks. In other words, she was overcome by fear."). Unlike Brooks, Bishop did not threaten H.C. But, a victim does not need to be threatened to be overcome by fear. See *Borthwick*, 255 Kan. at 912.

Whether a victim is "overcome by force or fear" is "a finding only [the jury] is entitled to make." *State v. Chaney*, 269 Kan. 10, 22, 5 P.3d 492 (2000); see also *Borthwick*, 255 Kan. at 913-14 ("[W]hen a victim testifies that she was overcome by fear, and her testimony is not 'so incredible as to defy belief,' [citation omitted], there is sufficient evidence to present the ultimate determination to the factfinder."). Accordingly, we find that the State presented sufficient evidence that H.C. was overcome by fear in Counts 1 and 6 to submit the issue to the jury.

> *There was sufficient evidence to find that H.C. was overcome by force or fear in Count 1.*

Because there is sufficient evidence of fear to sustain Bishop's conviction in Count 1, it is unnecessary to address this issue. In the caselaw, appellate courts rarely separate force and fear analyses. Since Bishop raises the issue, however, we will address it.

In Count 1, the State alleged that Bishop committed rape by inserting a vibrator into H.C.'s vagina while she was overcome by force or fear instead of just fear as in Count 6. There was some evidence of force in this case. H.C. testified that Bishop held her hand while entering the bedroom. She told Detective Ehrlich that he pushed her on the bed.

Bishop's primary argument on this issue is that H.C. specifically testified that she did not feel like Bishop forced her to enter the bedroom. This is similar to the appellant's argument in *Borthwick*, 255 Kan. at 911. There, Donald Borthwick was convicted of

21

raping J.C., a 21-year-old woman with spastic hemiplegia cerebral palsy. J.C. could not walk without assistance or stand without support due to her condition. One day, J.C. invited Borthwick to her home to watch movies. After arriving, Borthwick rubbed her back, lifted her shirt and bra, and started "'chewing'" on her breast. 255 Kan. at 902. J.C. asked Borthwick to stop, but he did not. Borthwick "laid J.C. down on the floor on her back, lifted her legs, pulled down her shorts and underpants, and put his fingers in her vagina." 255 Kan. at 902. J.C. asked him to stop. She also tried keeping her legs together, but they kept falling apart. She "testified that she was afraid and felt powerless to stop what was happening." 255 Kan. at 902. On appeal, Borthwick argued that there was insufficient evidence that J.C. was overcome by force or fear. He relied on J.C.'s testimony that he "did not force her in any fashion and that he did not threaten her." 255 Kan. at 903. Additionally, she "did not give him any indication, verbal or otherwise, that she was afraid, other than her attempts to keep her legs together." 255 Kan. at 903. The Kansas Supreme Court rejected Borthwick's argument, holding that the evidence was sufficient to show that J.C. was overcome by force or fear. 255 Kan. at 914.

Here, H.C. also testified that she did not feel forced by Bishop. In *Borthwick*, the Kansas Supreme Court made clear that evidence supporting a conviction for rape will not be overturned merely because the victim testifies that he or she does not feel forced into sexual intercourse. The evidence of force in this case provides more support for the jury's decision to convict Bishop of rape in Count 1.

*There was sufficient evidence to convict Bishop of Count 3, indecent liberties with a child.*

In Count 3, the State charged Bishop with indecent liberties with a child for touching H.C.'s breasts and buttocks underneath her clothing. The State alleged that the crime occurred on or between November 15, 2014, and December 31, 2014. On the third day of trial, after H.C. testified, the State amended Count 3 to allege that Bishop only

22

touched H.C.'s breasts underneath her clothing. In Count 2, the State charged Bishop with indecent liberties with a child for touching H.C.'s breasts and buttocks on top of her clothing. The State alleged that this crime occurred on or between November 1, 2014, and November 30, 2014. The jury convicted Bishop on Count 3 but found him not guilty of Count 2.

Bishop argues that the State failed to present sufficient evidence that he touched H.C.'s breasts underneath her clothing between November 15, 2014, and December 31, 2014. He argues that the evidence shows that the improper touching occurred after December 31, 2014. While he is primarily challenging the sufficiency of the evidence, he states that "[i]n the event this Court views this issue as one involving a non-element, [he] alternatively raises this as a due process issue in a broader sense: that the Fifth, Sixth and Fourteenth Amendments to the United States Constitution guarantee the accused a fair trial before an impartial jury." In reply, the State argues that the evidence shows that the crime occurred during the time alleged. Alternatively, the State argues that because time is not an indispensable element of indecent liberties with a child it was not required to prove the date range beyond a reasonable doubt.

Again, we review the evidence in the light most favorable to the State to determine whether we are convinced that a rational fact-finder could have found Bishop guilty beyond a reasonable doubt. See *Chandler*, 307 Kan. 668.

H.C. turned 15 years old in September 2014, during her freshman year of high school. She testified that Bishop began kissing her during her freshman year. She then testified that his inappropriate actions progressed, although she did not give a specific timeline of the progression. In her interview with Detective Ehrlich, H.C. said that Bishop probably started touching her breasts two months prior to the interview. This would have been approximately November of 2015. This is one year after the dates alleged in the complaint. The State cites Detective Ehrlich's affidavit for application for

23

an arrest warrant as evidence that the offense occurred during the time alleged. In the affidavit, Detective Ehrlich included a timeline of events. However, the dates in the timeline do not match the dates H.C. provided in the interview or at trial. And, there is no indication that the State introduced the affidavit as evidence. Therefore, the State failed to present sufficient evidence that the actions alleged in Count 3 occurred during the specified time frame.

Even if the evidence does not support the State's contention that the offense occurred during the dates alleged, the Kansas Supreme Court "has held on numerous occasions that the precise time of the commission of an offense need not be stated in the indictment or information." *State v. Wonser*, 217 Kan. 406, 407, 537 P.2d 197 (1975). As long as "a defendant is not misled or prejudiced in making his defense by the allegation concerning the date of the crime charged, that date is unimportant, and a conviction may properly follow upon sufficient proof of the commission of the offense at any time within the provisions of the statute of limitations." *State v. Jones*, 204 Kan. 719, 725, 466 P.2d 283 (1970); see *Wonser*, 217 Kan. at 407 ("Except where the time is an indispensable ingredient of the offense, it is sufficient if shown to have been within the statute of limitations."). Time is not an indispensable ingredient of the crime of indecent liberties with a child. 217 Kan. at 407. Both parties acknowledge this rule. Moreover, there is no evidence that the offenses occurred outside the statute of limitations, which does not expire until 10 years after H.C. turns 18. K.S.A. 2018 Supp. 21-5107(c)(2). Thus, the only remaining issue is whether Bishop was prejudiced by the State's failure to prove that the crime occurred during the dates alleged.

Bishop argues that he was prejudiced because the State's theory was that his behavior escalated over time. Thus, time did matter to the State's theory. Bishop notes that the jury found him not guilty of the first "'phase'"—touching on top of the clothes—but it did find him guilty of the second "'phase'"—touching under the clothes.

24

While Bishop's assertions may be true, it does not lead to the conclusion that he was prejudiced by the State's failure to prove that Count 3 occurred during the times alleged. Bishop's defense was to deny the accusations and cast doubt on H.C.'s credibility. He did not present an alibi. He fails to explain how his defense would have changed if the State had charged him in a different time frame. See *State v. Nunn*, 244 Kan. 207, 227-28, 768 P.2d 268 (1989) ("The appellant in this case did not attempt to assert an alibi defense . . . ; he simply denied having ever committed any sexual acts toward[] the complainants. Appellant has not demonstrated that he was misled or prejudiced in making his defense by the amendment concerning the dates of the offenses charged.").

*The State did not commit reversible prosecutorial error during closing arguments.*

Finally, Bishop argues that the State committed prosecutorial error during closing arguments by making arguments unsupported by the evidence and by improperly vouching for H.C's credibility.

Appellate courts use a two-step process to evaluate claims of prosecutorial error:

"These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292

25

Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* [565 U.S. 1221] (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

Bishop makes several claims of prosecutorial error. But because we have already determined that Count 6 should be reversed, there is no need to examine any error associated with that count. We have reviewed the remaining claims of prosecutorial error and find no reversible error.

*Introduction of facts not in evidence*

"A prosecutor has wide latitude in crafting arguments and drawing 'reasonable inferences from the evidence but may not comment on facts outside the evidence.'" *State v. Longoria*, 301 Kan. 489, 524, 343 P.3d 1128 (2015) (quoting *State v. Novotny*, 297 Kan. 1174, Syl. ¶ 7, 307 P.3d 1278 [2013]).

As to Count 1, rape, the prosecutor argued that "the defendant taking [H.C.] into the bedroom could be sufficient for you to find if you find beyond a reasonable doubt that that is force. It's up to you to decide." Bishop argues that this statement constituted a comment on facts not introduced as evidence. He notes that H.C. testified that she did not feel forced to enter the bedroom. However, the State did introduce evidence that Bishop applied force to H.C. during the incident in the form of holding her hand and pushing her onto the bed. Therefore, the prosecutor's statement that Bishop used force does not constitute a comment on facts outside of the evidence.

Also as to Count 1, Bishop argues that the prosecutor referred to facts not in evidence by telling the jury that H.C. acquiesced to Bishop's requests because she was afraid his behavior would escalate if she did not. What H.C. actually said was that she

26

believed that Bishop's behavior was escalating. This thought contributed to her choice to report Bishop. Even though the prosecutor misstated the evidence we find the error to be harmless. In other words, there is no reasonable possibility that the error contributed to the verdict. See *Sherman*, 305 Kan. at 109; *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012). The court instructed the jury that statements, arguments, and remarks of counsel are not evidence, and that the jury should disregard any statements made that are no supported by evidence. The jury heard the evidence and could determine that H.C. never alleged that she acquiesced to Bishop's requests because she was afraid his behavior would escalate. Accordingly, we find that this error was harmless and does not justify reversal of Bishop's conviction of Count 1.

As to Count 3, the State utilized a PowerPoint presentation during closing arguments. One slide was titled "Touching [H.C.]'s Breasts." It listed things that H.C. said about Bishop touching her breasts and Bishop's responses. On the "H.C. said" side, the slide said: (1) "Defendant has touched her breasts beginning 2 years prior"; (2) "If wearing a tank top, he pulled it open & put his hand inside"; and (3) "Also touched breasts on top of shirt." Bishop argues that this slide incorrectly states the evidence because there was no evidence that he had been touching her breasts underneath her clothing for two years prior to her disclosure. Bishop is correct that the evidence does not support this assertion. But the slide does not say that he was touching her breasts underneath her clothing for two years prior to her disclosure, just that he had been touching her breasts. He argues that the touching referenced in the slide was clearly intended to mean touching underneath the clothes. The inference is not as clear as Bishop insists and does not constitute a comment on facts not in evidence. So this claim of error also fails.

27

*Improper voucher for witness credibility*

Finally, Bishop alleges that one of the prosecutor's comments constituted an improper voucher for witness credibility and a comment on facts not in evidence. While the prosecutor was discussing the consistency in H.C.'s disclosures to her uncle, interview with Detective Ehrlich, and trial testimony, she stated:

> "Ladies and gentlemen, we can criticize Uncle Mike all we want. But look at the corroboration. What did [H.C.] not tell him? She didn't tell him about the vibrator and the masturbation. The two rape counts. The most serious counts. But why would that be? Maybe she was embarrassed to tell her uncle all that. And if [H.C.] was truly gonna up the ante in this situation why wouldn't she just go in and tell Detective Ehrlich that there was vaginal penile sex? Why not just throw that out there and lay it out there? Why didn't she say that? Because [H.C.] was very clear. It never got to that point. . . . She spoke up before that happened. She was afraid it was gonna get to that point, but she spoke up before it did get to that point."

Bishop argues that the prosecutor's comment that H.C. was embarrassed to tell her uncle about the events underlying the rape counts constitutes arguing facts not in evidence. Bishop is correct that H.C. never explained why she did not tell her uncle about those incidents. However, the statement is not exactly a statement of fact. The way the statement is phrased, and the prosecutor's use of the word "maybe," signifies that this is an inference that the prosecutor drew from the fact that H.C. did not tell her uncle about certain things. "[P]rosecutors are allowed '"to craft arguments that include reasonable inferences to be drawn from the evidence."'" *State v. Banks*, 306 Kan. 854, 862, 397 P.3d 1195 (2017) (quoting *State v. Stone*, 291 Kan. 13, 19, 237 P.3d 1229 [2010]). Therefore, this statement was not error.

Bishop's other argument regarding the prosecutor's comments is that they constitute an improper comment on witness credibility. He argues that the prosecutor

"vouched for [H.C.]—she was telling the truth because if she wasn't, she would 'just go all in' and allege that Mr. Bishop put his penis in her vagina."

"[I]t is 'improper for a prosecutor to attempt to bolster the credibility of the State's witnesses.'" *State v. Sprague*, 303 Kan. 418, 428, 362 P.3d 828 (2015) (quoting *State v. Donaldson*, 279 Kan. 694, 708, 112 P.3d 99 [2005]). Prosecutors are prohibited from stating their "personal belief as to the reliability or credibility of testimony given at a criminal trial." *State v. Brinklow*, 288 Kan. 39, Syl. ¶ 6, 200 P.3d 1225 (2009). However, "[t]he latitude given to the State includes 'explaining to juries what they should look for in assessing witness credibility, especially when the defense has attacked the credibility of the State's witnesses.'" *Sprague*, 303 Kan. at 428-29 (quoting *State v. McReynolds*, 288 Kan. 318, 325, 202 P.3d 658 [2009]).

In this case, the prosecutor was in the process of explaining to the jury how it could assess H.C.'s credibility. The prosecutor began the discussion by stating: "[T]o judge [H.C.]'s credibility you need to look for corroboration and consistency." The prosecutor then listed the facts which she asserted showed corroboration and consistency. While the prosecutor's statement was likely intended to bolster the State's case by showing that H.C. was credible, the prosecutor did not state her personal belief as to H.C.'s credibility. See *State v. Chanthaseng*, 293 Kan. 140, 148, 261 P.3d 889 (2011) (finding no error even though prosecutor specifically stated that the victim was a credible witness at five different times during closing arguments because each statement was coupled with a discussion of the evidence presented at trial). This claim of error fails.

In sum, we find no reversible error in any of the prosecutor's statements in closing argument.

Bishop's conviction for Count 6, rape, is reversed for insufficient evidence. The balance of his convictions are affirmed.

Affirmed in part and reversed in part.