NOT DESIGNATED FOR PUBLICATION

Nos. 121,304
121,305

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JAMES L. PERKINS,
*Appellant*.


MEMORANDUM OPINION

Appeal from Pawnee District Court; DALE E. SNYDER and JULIE F. COWELL, magistrate judges. Opinion filed September 25, 2020. Affirmed.

*Kristen B. Patty*, of Wichita, for appellant.

*Michael J. Duenes*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.


Before WARNER, P.J., STANDRIDGE and GARDNER, JJ.

PER CURIAM:  James L. Perkins appeals his conviction for harassment by telecommunications device and the revocation of his probation in a prior domestic battery case. He argues that there was insufficient evidence to convict him of harassment by telecommunications device because his messages were neither abusive nor threatening and that the court abused its discretion in revoking his probation. For the reasons stated below, we affirm Perkins' conviction and dismiss as moot the challenge to his probation revocation issue.

FACTS

On September 24, 2018, Perkins pled no contest to domestic battery. The district court sentenced Perkins to a 6-month jail term, suspended to 2 days, and ordered 12 months' probation. The court also ordered Perkins to have no contact with his ex-girlfriend, M.S., who was the victim in the domestic battery case.

On October 5, 2018, the State moved to revoke Perkins' probation, alleging that he violated the conditions of his probation by contacting M.S. several times between September 8, 2018, and October 2, 2018. Based on this same conduct, the State separately charged Perkins with harassment by telecommunications device in violation of K.S.A. 2018 Supp. 21-6206(a)(1)(C).

On October 25, 2018, the district court revoked Perkins' probation and ordered him to serve his 6-month jail term, less 25 days of jail credit. Perkins filed a timely notice of appeal. Perkins completed serving his sentence on the domestic battery conviction on March 30, 2019.

On April 8, 2019, the district court held a bench trial on Perkins' telecommunication harassment charge. M.S. and Larned Police Sergeant Anthony Boor testified for the State. The State also introduced two exhibits into evidence, which showed Perkins' text messages and phone calls to M.S. The information within these exhibits reflects that Perkins had texted or called M.S. 37 times in less than a month. Perkins sent many of these texts during the first few days of his probation term. Perkins did not testify or present any evidence.

At the close of the State's evidence, defense counsel moved for a directed verdict on grounds that the State failed to establish Perkins had specific intent to commit the crime of harassment by telecommunications device. Defense counsel asserted that the

2

statute does not allow inference stacking and that there was "no effort . . . made to elicit any statement whatsoever from Mr. Perkins and nobody on the State side gave any evidence supporting the finding of intent." The State responded that the district court was permitted to make reasonable inferences from the evidence presented and that the actual words used supported an inference that Perkins intended to harass or otherwise abuse M.S. The court denied Perkins' motion.

Defense counsel then introduced Sergeant Boor's probable cause affidavit as supporting evidence and renewed the motion for a directed verdict. The district court denied the renewed motion. The court then found Perkins guilty of harassment by telephone and imposed a 180-day suspended jail sentence with 12 months' probation. In support of its guilty verdict, the district court found that "reasonable inferences can be made from the text messages as submitted in State's Exhibit A" that Perkins sent the texts in order to harass M.S. "because . . . by the time that we get to the end of these [messages] there's really no other inference that can be made."

Perkins timely appealed his conviction. After the appeal was docketed, this court granted Perkins' request to consolidate the appeal of his probation revocation and the appeal of his conviction.

ANALYSIS

*Appeal from conviction*

Perkins argues there was insufficient evidence to convict him of harassment by telecommunications device. When a defendant challenges the sufficiency of the evidence in a criminal case, we review the entire record in a light most favorable to the State and ask whether we are convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713

3

(2018). For the evidence to be sufficient, "there must be evidence supporting each element of [the] crime." *State v. Kettler*, 299 Kan. 448, 471, 325 P.3d 1075 (2014). In making this inquiry, we will not reweigh evidence, resolve evidentiary conflicts, or make determinations about the credibility of witnesses. *Chandler*, 307 Kan. at 668; *State v. Lloyd*, 299 Kan. 620, 632, 325 P.3d 1122 (2014). And convictions need not be proved by direct evidence; circumstantial evidence may be sufficient to support a verdict so long as "it permits the factfinder to draw a reasonable inference regarding the fact(s) in issue." *State v. Banks*, 306 Kan. 854, 859, 397 P.3d 1195 (2017).

The State charged Perkins with violating K.S.A. 2019 Supp. 21-6206(a)(1)(C), which prohibits using a "telecommunications device" to "make or transmit any comment, request, suggestion, proposal, image or text with intent to abuse, threaten or harass any person at the receiving end." A telecommunications device "includes telephones, cellular telephones, telefacsimile machines and any other electronic device which makes use of an electronic communication service, as defined in K.S.A. 22-2514, and amendments thereto." K.S.A. 2019 Supp. 21-6206(d). In this case, all the contacts occurred through Facebook Messenger, a messaging application for Facebook users to contact each other by sending messages or images or by making audio or video calls through their smartphone or on a personal computer.

To support his claim of insufficient evidence under the statutory elements, Perkins argues the State failed to prove his messages were threatening or abusive. Contrary to Perkins' argument, however, a conviction for violating K.S.A. 2019 Supp. 21-6206(a)(1)(C) is not limited to abusive or threatening statements. The crime includes messages intended to abuse, threaten, *or harass* another person. See K.S.A. 2019 Supp. 21-6206(a)(1)(C). So the State only needed to prove that Perkins used a telecommunications device to send a message with the intent to harass M.S.

4

The statute itself does not define what it means to "harass" someone, but the dictionary definition of "harass" is "to trouble, worry, or torment, as with cares, debts, repeated questions or demands, etc." Webster's New World College Dictionary 660 (5th ed. 2014). Another dictionary, this one cited by the State, defines "harass" as "to annoy persistently" or "to create an unpleasant or hostile situation for[,] especially by uninvited and unwelcome verbal or physical conduct." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/harass (last visited September 18, 2020). In order to meet its burden, the State introduced Exhibits A and B into evidence. Exhibit A showed photographs of the Facebook messages Perkins sent to M.S., while Exhibit B showed Sergeant Boor's notes detailing a chronological account of the contacts from Perkins to M.S. These two exhibits reflect the following contacts:

Unknown date

- Unknown time—(poop emoji)

September 8

- 1:23 a.m.—"Really, who did u have while I was in jail"
- 1:46 a.m.—"Don't matter it's what you been doing robbing me for u and ur dicks."

September 9

- 11:31 p.m.
  - (kiss emoji)
  - (teddy bear sticker)

September 11

- 3:31 a.m.
  - (missed call and five-second voice message)
  - "Who said to leave u the fuck alone"
- 5:26 a.m.—(missed call)

5

September 12

- 1:39 p.m.—(*missed call from M.S. to Perkins*)
- 1:40 p.m.—(missed call)

September 13

- 3:36 p.m.—(kiss emoji)
- Unknown time
    - "So waitn 4 u to call"
    - (winking/kissing emoji)

September 18

- 3:02 a.m.—(image)

September 19

- 1:43 a.m.—"So u and fucking Jeff and Scott how much you make"
- 4:01 a.m.—"So what the fuck u robbing me again why u leave. I have witness . . . Playing who brought u Jeff"
- 4:22 a.m.—(missed call)
- 1:52 p.m.—(missed video chat)

September 20

- 12:22 p.m.
    - "Hi"
    - "Wish we could of talked the other morning y did u leave what we're u doing"
    - "Waiting to see what's wrong with the car."
- 12:57 p.m.—"Never mind ur plotting I feel as if you hadn't done enough how's the surprise coming."
- 7:07 p.m.—(missed call)

- 8:31 p.m.
  - "Thanks for the ring u have a date if so so be it I know how much u like to cum"
  - (text saying "A contact set the emoji to [hand showing peace sign]")
  - "U busy"

September 22
- 1:38 a.m.—(missed call)
- 3:24 a.m.—"Love you go ahead and u won u destroyed me. That's what you wanted to do and u have in the whole since of the word."

September 23
- 3:35 a.m.—"Will you please talk to me"
- 3:41 a.m.—(missed video chat)
- 3:59 a.m.—(missed call)
- 4:27 a.m.
  - "I finally got ur message open u wanted me to hear u fucking whoever. U were doing that for weeks. Why we're u creeping around the house? Did you hear me fucking? And that morning Denise ran In to u n the back yard I had no idea she was coming did . . . "
  - "nothing with her she thought since u were gone we would be a couple, WRONG she left crying and now they got u right where they want and need. Like nevertheless ur so white which is blue eyed Devils"
- 5:30 a.m.
  - "Hello I now I going away and I wish you would say something"
  - "I'm going away do you want a fish tank"
- 7:44 a.m.—"If ur with someone else say so. You are . . . ."

Either September 23 or 24

- Unknown time—"If ur with someone else say so. You are a good woman"
- Unknown time—(dog with heart sticker)

September 24

- 11:39 p.m.—"Happy"

September 27

- 2:37 a.m.
  - "Wishing you were able to understand that I had to get a PFA so I didn't go back to jail for you. They are getting what they want. I will never understand why you started that fight why?"
  - "You can run tell doug nothing matters now. I never thought I would be in a situation like this at this point in my life and I do miss you"
- 2:55 a.m.—"Guess I'm the talk of the town u really know how to get to a person. Anyways you already have another the word is that u were planning this for awhile. Funny how much you love to hate me you were good. All this to be with someone else"

September 28

- Unknown time—"[W]hy didn't you just go. I didn't know how much you hated me that you made sure I would go to jail. So so sad you have to be like that. But it makes you feel better. I see you are looking at these sure u and ur dick are having a good laugh. So I guess I'll go so you can talk about what a wonderful job you have done and I get arrested again."
- 2:40 a.m.
  - (*crying/laughing emoji from M.S. to Perkins*)
  - "U going to talk to me?"

- o "Just having a laugh at me. (broken heart emoji)"
- 3:03 a.m.—"Thanks for the ring good bye."
- 3:56 a.m.—"Love u and sorry for taking ur love for granted. But my payback is enduring ur wrath. Promise to leave u alone with ur new lover."
- 10:32 p.m.—"Sorry for bothering you but wish I could see you soon. T J's truck is parked in the yard he's not living here. Can you please answer."
- 11:05 p.m.—"Just say fuck off not used to u not saying anything."

September 30
- 4:42 a.m.—(crying/laughing emoji)

October 1
- 1:01 a.m.—"We need to talk about the things you took and the scooter is sold don't need the key . . . want to keep things ugly?"
- 4:17 a.m.—(missed call)
- 12:29 p.m.—"Bringing ur mail"
- 12:51 p.m.—"Let's see how far teddy can go." (linked image of teddy bear with text "We are sending TEDDY on a journey for cancer awareness. Please share and see how far he can get!")

The evidence presented in these exhibits shows Perkins sent close to 40 messages to M.S.—including accusations of infidelity and theft, as well as often using obscene language—and attempted to call her eight times between September 8 and October 1, 2018. During this time, Perkins had been ordered not to have contact with M.S. because of the previous domestic battery case. Considering the evidence in the light most favorable to the State, we find the text messages and the attempted phone calls were sufficient for a rational fact-finder to have found beyond a reasonable doubt that Perkins made and transmitted to M.S. comments, requests, suggestions, proposals, images, and

text with the intent to trouble, worry, torment, annoy persistently, and create an unpleasant or hostile situation by uninvited and unwelcome verbal conduct. For this reason, we affirm Perkins' conviction for harassment by telecommunications device in violation of K.S.A. 2019 Supp. 21-6206(a)(1)(C).

*Probation revocation*

Perkins next argues the district court abused its discretion in revoking his probation and imposing the underlying sentence for his domestic battery conviction. But Perkins concedes that he completed this sentence on March 30, 2019. For this reason, the State argues that Perkins' claim on this issue is moot.

As a general rule, Kansas appellate courts do not decide moot questions or render advisory opinions. *State v. Montgomery*, 295 Kan. 837, 840, 286 P.3d 866 (2012). The mootness doctrine is one of court policy, under which the court is to "'determine real controversies relative to the legal rights of persons and properties which are actually involved in the particular case properly brought before it and to adjudicate those rights in such manner that the determination will be operative, final, and conclusive.'" 295 Kan. at 840. An issue is moot if "'it [is] clearly and convincingly shown the actual controversy has ended, the only judgment that could be entered would be ineffectual for any purpose, and it would not impact any of the parties' rights.'" 295 Kan. at 840-41. Because mootness is a doctrine of court policy, appellate review is unlimited. *State v. Hilton*, 295 Kan. 845, 849, 286 P.3d 871 (2012).

As the party asserting mootness, the State bears the burden of establishing a prima facie showing of mootness, which can be done by showing the defendant has "fully completed the terms and conditions of his or her sentence." *State v. Roat*, 311 Kan. 581, 593, 466 P.3d 439 (2020). Here, the State relies on Perkins' own statement in his brief

that he already has served his underlying term of incarceration. The State therefore has satisfied its initial burden of showing a prima facie case of mootness.

A final "determination of mootness must . . . include analysis of whether an appellate judgment on the merits would have meaningful consequences for any purpose, including future implications." 311 Kan. at 592-93. The defendant has the "burden of demonstrating the existence of a meaningful interest that would be impaired by dismissal." 311 Kan. at 593. But Perkins makes no claim on appeal that the existence of a meaningful interest would be impaired by dismissal of his claim as moot. Nor does Perkins claim that an exception to the mootness doctrine applies. See *State v. Kinder*, 307 Kan. 237, 244, 408 P.3d 114 (2018) (exception to mootness doctrine applies for cases that are otherwise moot but raise issues that are capable of repetition and present concerns of public importance); see also *Roat*, 311 Kan. at 590 (deeming mootness a prudential doctrine subject to exceptions and therefore not a jurisdictional issue). Given Perkins' failure to allege impairment of a meaningful interest or an exception to the mootness doctrine, we dismiss as moot Perkins' claim alleging the district court abused its discretion in revoking his probation.

Affirmed.